## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AUTUMN LAMPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MITRA QSR, LLC, MITRA QSR KNE, LLC, | ) | |
| and KFC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT

### The Parties & Jurisdiction

1.     Plaintiff Autumn Lampkins ("Ms. Lampkins") is a resident of Wyoming, Kent County, Delaware.

2.     Defendant Mitra QSR, LLC, is a Texas corporation that conducts business in the State of Delaware.  Upon information and belief, Mitra QSR, LLC's, principal place of business is located at 18900 Dallas Parkway #125, Dallas, Texas 75287.  Upon information and belief, Mitra QSR, LLC, employs more than 500 employees nationwide.

3.     Defendant Mitra QSR KNE, LLC, is a Texas corporation that conducts business in the State of Delaware.  Upon information and belief, Mitra QSR KNE, LLC's, principal place of business is located at 18900 Dallas Parkway #125, Dallas, Texas 75287.  Upon information and belief, Mitra QSR KNE, LLC, employs more than 500 employees nationwide.

4.     Defendant KFC Corporation is a Delaware corporation that conducts business in the State of Delaware.  Upon information and belief, KFC Corporation's address is 1900 Colonel Sanders Lane, Louisville, KY  40213.  Upon information and belief, KFC Corporation employs more than 500 employees nationwide.

1

5.      The three Defendants, individually and/or collectively, operate KFC Restaurants in Kent County Delaware.  Specifically, the Defendants, individually and/or collectively, operate a KFC restaurant located at 344 Walmart Drive, Camden, Delaware 19934 (the "Camden Store"), and a KFC restaurant at 223 S. DuPont Highway, Dover, Delaware 19901 (the "Dover Store").

6.      Ms. Lampkins was employed by Mitra QSR, LLC and/or Mitra QSR KNE, LLC (collectively, "Mitra") to work in the Camden Store and, subsequently, the Dover Store.

7.      Upon information and belief, KFC Corporation exercises sufficient control over its franchisees, including the Mitra entities, through its policies and contractual requirements that KFC Corporation is, in effect, a joint employer of the Mitra entities' employees.

8.      Ms. Lampkins submitted a Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC") against all three Defendants on October 6, 2015.  The Charge against the two Mitra entities was assigned Charge Number 530-2016-00246.  The Charge against KFC Corporation was assigned Charge Number 530-2016-00908.

9.      The EEOC dismissed the Charge against KFC Corporation through a letter to Ms. Lampkins dated April 29, 2016.  The stated reason was:  "The evidence submitted reveals that you were an employee for Mitra QSR, not for Respondent" KFC Corporation.

10.      On July 1, 2016, Ms. Lampkins requested a Right-to-Sue Letter from the EEOC for the Charge against the two Mitra entities.  The basis for the request for the Right-to-Sue Letter was that more than 180 days had elapsed since the Charge was submitted to the EEOC.

11.      The Right-to-Sue Letter for the Charge against the two Mitra entities was mailed by the EEOC on or about July 5, 2016.

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

### Ms. Lampkins' Initial Hiring & The Camden Location

13.     Ms. Lampkins was hired by Mitra to begin work as an Assistant Restaurant Manager on or about December 29, 2014.  Her pay was supposed to be $30,000 on an annual basis.  Her formal employment began at the Camden Store for training purposes.  After training, she was told she would be transferred to a restaurant in Smyrna, Delaware.

14.     Ms. Lampkins' son was born on August 7, 2014, prior to beginning her employment with Mitra.  Ms. Lampkins made the decision to breastfeed her son.  Breastfeeding is a female attribute that occurs because and after a woman is pregnant.

15.     Ms. Lampkins was hired by the District Manager/Coach Lori Davis ("Ms. Davis") who was aware that Ms. Lampkins was breastfeeding.  Ms. Davis assured Ms. Lampkins breastfeeding would not be a problem.  Ms. Davis further relayed they had another manager employed who was also breastfeeding.

16.     At the Camden Store, Ms. Lampkins had to ask permission to go pump breastmilk because she was in training.  At the Camden Store, Ms. Lampkins worked a 10-hour shift, and she typically only got to pump once per shift rather than the recommended once every two hours.

17.     When working for the original District Manager/Coach Lori Davis, Ms. Lampkins was instructed to go to the restroom to pump and/or express breast milk.  The restroom at the Camden Store was a single-stall facility.  When she used it to pump, she tied up the restroom for approximately 15 to 20 minutes.

18.     After a couple of weeks of tying up the restroom, Ms. Lampkins was instructed to stop using the restroom to pump and to begin using the manager's office.  The manager's office, however, had a surveillance camera.

19.     Defendants' answer to alleviating her privacy concerns was for Ms. Lampkins to bring a cover and express breastmilk under the cover.  She was also told to pump "away from the camera."  Ms. Lampkins reluctantly complied out of fear of losing her job.  But Ms. Lampkins was concerned her breasts would still be viewable on the camera.

20.     Other employees would walk in and out of the manager's office while Ms. Lampkins was pumping breastmilk.  Those individuals were another Assistant Manager, Bo O'Connell, Joanna Butz, Nakia Anderson, and Joy Rhinehardt, who was the General Manager of the Camden Store.  Everyone came in the office while Ms. Lampkins was expressing breast milk to ostensibly check the "speed of service" statistics.

21.     Bo O'Connell, in particular, would enter the office whenever he pleased without knocking before entering.  He used his key to open the locked door behind which Ms. Lampkins was expressing breastmilk.

22.     Ms. Lampkins recalls the males being more bothered by her pumping breastmilk than the females.  Bo O'Connell told her she was not to pump at work because she should be doing this at home.  Ms. Lampkins complained to Joy Rhinehardt who told Mr. O'Connell that he was wrong in his comment and needed to let Ms. Lampkins pump.

23.     Ms. Lampkins' feedback forms from her training at the Camden Store indicated she was doing well.  The only negative feedback was that she was behind on the training.  Ms. Lampkins was trained on the floor rather than in a training class.  Such training would be interrupted if, for example, another employee called out or did not come to work.  If that

occurred, the trainers had to work rather than take time to train Ms. Lampkins. Thus, if Ms. Lampkins was behind on her training, it was because her trainers had not taught or showed her a particular skill; it was not the fault of Ms. Lampkins. The feedback forms support this in that they often indicate it was the responsibility of Ms. Lampkins and/or her supervisor, Joy Rhinehardt, to fill in the content gap.

### Ms. Lampkins' Demotion & Transfer to the Dover Location

24.     The District Manager/Coach position changed just prior to the end of Ms. Lampkins' training, and Ms. Davis was no longer in that role. The new District Manager was Emily Martin.

25.     At the end of training, Emily Martin told Ms. Lampkins she was going to move Ms. Lampkins to the position of Shift Supervisor at the Dover Store rather than sending her to the Smyrna, Delaware, store as the assistant manager, pursuant to the original plan. This was a demotion and was not at Ms. Lampkins' request. Ms. Lampkins never indicated the Camden Store was "too much for her."

26.     As a Shift Supervisor, she was charged with overseeing or managing a shift at the Dover Store.  In connection with her demotion, Ms. Lampkins' pay decreased from approximately $10.49 or $10.50 per hour for approximately 50 hours per week at the Camden Store to $10.00 per hour for approximately 30-40 hours per week at the Dover Store.

27.     Emily Martin explicitly told Ms. Lampkins that her demotion to Shift Supervisor was because she was pumping breastmilk while at work. Emily Martin explained it would be easier because the Dover store was a "base store" with less volume and less responsibilities, making it easier to go into the office to pump.  She told Ms. Lampkins that once Ms. Lampkins completed breastfeeding, she could move to another location as the Assistant Manager.

28.     Lisa Rhinehardt was Manager of the Dover location and, upon information and belief, is the step-daughter of Joy Rhinehardt.

29.     Lisa Rhinehardt had previously tried to breastfeed her recently-born child, but Lisa Rhinehardt told Ms. Lampkins she ceased breastfeeding altogether because she could not simultaneously express breastmilk at work and keep up with the responsibilities of her job.

30.     At the Dover Store, it was apparent when Ms. Lampkins was pumping because she would have to leave her post to pump.  She would also typically announce she was going to pump.

31.     When Ms. Lampkins first arrived at the Dover Store, there were no problems.  As time progressed, however, things worsened.  Specifically, three problems occurred.

32.     First, she was unable to pump at the store, causing her embarrassment, pain, and a decrease in breastmilk supply for her son.  At the Dover Store, she only got to pump once during an 8-hour shift if she was lucky.  Indeed, she did not get to pump at all on some days while working at the Dover Store.

        a.     When the store became busy at night, Ms. Lampkins was unable to pump which caused her breasts to become engorged and lactate through her shirt.  This happened on one or two occasions.  Ms. Lampkins attempted to cover up the leakage to save her from embarrassment by going to the restroom and putting water on her shirt.

        b.     Ms. Lampkins also suffered a clogged milk duct, which was very painful.

        c.     Failure to pump breastmilk, decreases the supply, which was incompatible with her son being able to eat every two to three hours.  Thus, Ms. Lampkins had to resort to giving her son formula sooner than she wanted to since she was unable to pump breastmilk at work.

33.     Second, Ms. Lampkins was treated differently, not supported by management, and/or punished because of her need to pump.

a.      Ms. Lampkins was a Shift Supervisor, and she allowed all of her employees to take a break, whether they were legally entitled to a break or not.  Only after others took their breaks did she take a break.  On some days, this backfired, and she was unable to pump at all.  Ms. Lampkins asked Lisa Rhinehardt to briefly extend the shifts of one particular employee so Ms. Lampkins could build in some time to pump, but Lisa Rhinehardt refused to do so.  Lisa Rhinehardt's purported reason was that the specific employee was a minor who had to go to school the next day.  While the employee was a minor, the extended shift requested by Ms. Lampkins would not have violated any laws pertaining to the work of minors.

b.      Ms. Lampkins' subordinates told her that if she went to the office to pump, they would walk out of the restaurant.  One of these individuals was Destiny O'Connell, who is Bo O'Connell's sister.  Ms. Lampkins reported these threats and the fact that she was unable to pump to Lisa Rhinehardt.  Ms. Rhinehardt's solution, however, was to cut Ms. Lampkins' hours down to 20 hours per week.  Lisa Rhinehardt made no efforts to construct a schedule that would alleviate the problem or talk to the subordinates who were causing problems.

c.      At least one other Shift Supervisor was hired after Ms. Lampkins was constructively discharged.  Upon information and belief, that Shift Supervisor was given more hours of work per week than Ms. Lampkins.

34.     Third, Ms. Lampkins' privacy was not honored and/or protected.

a.      Initially, Ms. Lampkins used a corner of the office at the Dover Store to express breastmilk as it was out of view of the surveillance camera.  Ms. Rhinehardt told Ms. Lampkins a customer complained he or she had seen Ms. Lampkins' breast through a window in the office while she was pumping.  Ms. Lampkins always wore a cover when she was pumping, and Ms. Lampkins doubts the veracity of Ms. Rhinehardt's claim.  Ms. Lampkins was subsequently told she had to face the camera in the office while she pumped so that others could not see her.

b.      One on occasion, Ms. Lampkins covered the window on the door in the office at the Dover restaurant for added privacy.  The window on the door already contained sheets of paper known as "praises" from customers.  These praises were stuck to the window, but there was a gap where someone could still through the window.  Ms. Lampkins printed out another "praise" for a co-worker to use to cover up the last remaining open space of the window.  By the next day, the "praise" she put up had been removed while all of the other "praises" were left intact on the window.

c.      If the staff at the Dover restaurant needed something while Ms. Lampkins was pumping, they would knock on the door or talk through the door.  If it was a female staff member in the Dover restaurant who needed a personal item, such as a purse, Ms. Lampkins would allow her to enter the office to retrieve what she needed.  Ms. Lampkins never consented to allow a male staff member to enter the office while she was pumping.

d.      Despite her failure to allow a male staff member to enter the office while she was pumping, on one occasion, a male cook entered the office while Ms. Lampkins was pumping, without knocking or identifying himself, to ask her how much chicken he needed to cook.  Ms. Lampkins replied she did not know, and he needed to ask Destiny

O'Connell.  This led to a text message from Ms. Rhinehardt saying Ms. Lampkins was

wrong to not stop pumping and go out and instruct the cook because Destiny O'Connell

was not a manager.

        e.     Ms. Lampkins was not provided with a space to express her breastmilk

that was free from intrusion and obscured from the view of others.

35.     Ms. Lampkins was led to believe in her training that the footage from the

surveillance cameras at both locations could be viewed from the Mitra entities' headquarters in

Texas.

## Ms. Lampkins' Constructive Discharge

36.     Ms. Lampkins was "written up" on only one occasion.  She allegedly left loose

trash under a bag of trash inside the restaurant.  It was later learned the trash had been left by a

different shift on which Ms. Lampkins was not even working.   In response, Ms. Lampkins

requested, in writing, more training from Ms. Rhinehardt.  The training was not provided.

37.     Much of Lisa Rhinehardt's animus toward Ms. Lampkins stemmed from the fact

that Ms. Lampkins continued to prioritize breastfeeding when Lisa Rhinehardt was unable to do

so while keeping her job.

38.     In the Spring of 2015, Ms. Lampkins began looking for a new job because of the

ongoing harassment relating to her attempts to pump her breastmilk at work and because her

relationship with Lisa Rhinehardt deteriorated.

39.     Ms. Lampkins' relationship with Lisa Rhinehardt deteriorated in the following

ways:

        a.     Ms. Rhinehardt sent text messages to Ms. Lampkins complaining;

      b.      Lisa Rhinehardt was not providing any support to Ms. Lampkins when Ms. Lampkins' subordinates prevented Ms. Lampkins from pumping; and

      c.      Ms. Lampkins had been written up and, in response, requested more training, which Ms. Rhinehardt refused to provide.

40.      In April 2015, Ms. Lampkins found a jacket which had been left by a customer of the restaurant.  She threw it in a pile with her belongings, and she inadvertently took the jacket home.  Ms. Rhinehardt called Ms. Lampkins upset.  Ms. Lampkins explained taking the jacket was an accident, but Ms. Rhinehardt said she would call Emily Martin, the District Manager/Coach.

41.      Ms. Lampkins heard from a co-worker that Lisa Rhinehardt was going to use that mistake to terminate Ms. Lampkins.  The jacket incident was the last straw.

42.      All of the foregoing harassment, text message complaints, write ups, complaints, and accusations became intolerable to Ms. Lampkins continued employment with Defendants. Likewise, they were more than any reasonable person should have to endure in an employment relationship.  Therefore, on May 1, 2015, Ms. Lampkins quit her employment with Defendants in what amounted to a constructive discharge.

43.      When she began training, Ms. Lampkins was provided with a large notebook full of training materials.  Ms. Lampkins does not recall ever receiving a copy of an Employee Handbook.  Moreover, to the best of her knowledge, information, and belief, she did not have contact information for anyone at the Defendants' headquarters to whom she could complain about the harassment.  Other than the incidents noted above about which Ms. Lampkins complained, she did not report the harassment because she feared she would lose her job if she reported it.

44.     In addition to lost wages, Ms. Lampkins endured harassment and mistreatment, which caused her emotional distress and disruption of her life.

## COUNT I – GENDER DISCRIMINATION

45.     Plaintiff incorporates all foregoing allegations as if they are stated in this Count in full.

46.     Ms. Lampkins was discriminated against and/or treated differently in her employment with Defendants because, as a female, she had to express her breastmilk while working for Defendants.

47.     Ms. Lampkins was qualified for the job as evidenced by the lack of significant "write up's" and discipline against her.

48.     She suffered at least four adverse employment actions as a result of this discrimination

        a.      She was initially forced to pump her breastmilk in a restroom at the Camden Store in violation of federal law.  Only after it inconvenienced Defendants was she "allowed" to pump in an office in front of a video surveillance camera, where she had little to no privacy;

        b.      She was demoted to the Dover Store, with a different title, a lesser rate of pay, and she was specifically told she was demoted because she was breastfeeding;

        c.      At the Dover Store, she was still forced to express breastmilk in an office in front of a video surveillance camera, where she had little to no privacy; and

        d.      Because her breastfeeding was inconvenient to Defendants, she received complaints from her supervisor via text message, she was written up by her superior, and, ultimately, she was going to be terminated because she mistakenly took home a jacket

that a customer had left at the store one night.  As explained above in Paragraph 42, all of these events, when coupled with the harassment she endured, led her to quit in what amounts to a constructive discharge.

49.     These adverse employment actions imposed burdens upon Ms. Lampkins that would not be imposed upon male employees.

50.     This willful, intentional, and unlawful gender discrimination violates the laws and regulations of both the United States, including, without limitation, 42 U.S.C. § 2000e, *et seq.*, and the State of Delaware, including, without limitation, 19 Del. C. § 710, *et seq.*

WHEREFORE Plaintiff Autumn Lampkins respectfully requests this Court:

A.     Enter judgment in her favor jointly and severally against Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and Defendant KFC Corporation;

B.     Award her special damages, including lost wages, as she can prove, compensatory damages, and punitive damages;

C.     Award her costs and attorney's fees;

D.     Award her pre- and post-judgment interest;

E.     Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to cease and desist from discriminating against women and breastfeeding employees;

F.     Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to comply with state and federal laws regarding breastfeeding employees; and

G.     Grant such other relief as the Court deems appropriate.

## COUNT II - HARASSMENT

51.     Plaintiff incorporates all foregoing allegations as if they are stated in this Count in full.

52.     Ms. Lampkins was discriminated against and/or treated differently because, as a female, she had to express her breastmilk while working for Defendants.

53.     Ms. Lampkins had to endure pervasive and regular harassment from her managers and co-workers when, among other things:

      a.     She was initially forced to pump in a restroom in violation of federal law;

      b.     Only after it inconvenienced Defendants was she "allowed" to pump in an office in front of a video surveillance camera, where she had little to no privacy;

      c.     She was frequently interrupted by superiors and co-workers pumping in that office;

      d.     She was told not to pump in the office by a male co-worker;

      e.     She was demoted to the Dover Store, with a different title and a lesser rate of pay, and she was specifically told she was demoted because she was breastfeeding;

      f.     At the Dover Store, she was still forced to express breastmilk in an office in front of a video surveillance camera, where she had little to no privacy;

      g.     Her subordinate employees refused to allow her to express breastmilk and hindered her ability to do so by threatening to walk off the job if she did so.  After Ms. Lampkins complained to her supervisor about insubordination due to her need to express breastmilk, Ms. Lampkins' hours were cut;

      h.     Her supervisor complained to her about not being available to answer questions from other employees when she was in the office expressing breastmilk,

i.      She received write ups and text message complaints from her supervisor; and

j.      She was accused of stealing a jacket that a customer had left behind in the Dover Store.

54.    This harassment by her managers and co-workers detrimentally affected her in that, among other things:

a.      She was demoted with a corresponding decrease in the rate of pay and, ultimately, hours;

b.      She suffered physical pain as a result of being delayed and/or prevented from expressing breastmilk;

c.      She suffered a clogged milk duct;

d.      Her supply of breastmilk dried up prematurely;

e.      She leaked breastmilk onto her shirt at work causing her embarrassment and humiliation;

f.      She had to continue working in clothes soiled by leaking breastmilk causing her embarrassment and humiliation;

g.      She had to self-consciously express breastmilk in front of a surveillance camera, which caused embarrassment;

h.      She was interrupted while she expressed breastmilk which caused embarrassment;

i.      She suffered embarrassment, humiliation, emotional distress, and disruption to her life because of Defendants' actions; and

    j.  She was constructively discharged and was unable to find comparable employment for a period of time after May 2015.

  55.  The harassment by her managers and co-workers would detrimentally affect a reasonable person for all of the reasons stated herein, as the harassment and its results would cause decreased wages, pain, drying up, lost wages, and embarrassment and humiliation to a reasonable person.

  56.  The harassment of Ms. Lampkins by Defendants' managers and employees was willful and intentional.

  57.  Despite Ms. Lampkins complaining about these situations to her managers and/or supervisors and asking for, among other things, more training and support, no meaningful remedial action was taken with respect to the harassment.

  58.  This willful, intentional, and unlawful gender-based harassment and discrimination violates the laws and regulations of both the United States, including, without limitation, 42 U.S.C. § 2000e, *et seq.*, and the State of Delaware, including, without limitation, 19 Del. C. § 710, *et seq.*

  WHEREFORE Plaintiff Autumn Lampkins respectfully requests this Court:

  A.  Enter judgment in her favor jointly and severally against Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and Defendant KFC Corporation;

  B.  Award her special damages, including lost wages, as she can prove, compensatory damages, and punitive damages;

  C.  Award her costs and attorney's fees;

  D.  Award her pre- and post-judgment interest;

E.      Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to cease and desist from discriminating against women and breastfeeding employees;

F.      Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to comply with state and federal laws regarding breastfeeding employees; and

G.      Grant such other relief as the Court deems appropriate

### COUNT III – VIOLATION OF FAIR LABOR STANDARDS ACT ("FLSA")

59.      Plaintiff incorporates all foregoing allegations as if they are stated in this Count in full.

60.      The FLSA, as amended, requires that an employer allow a breastfeeding employee to take "reasonable break time . . . to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk."  Further, the employer must prove "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."  29 U.S.C. § 207(r).

61.      The FLSA applies to Defendants and to Ms. Lampkins' employment with Defendants.

62.      Defendants, through their agents and/or employees, willfully violated the relevant portions of the FLA in the following ways:

a.      Ms. Lampkins was initially forced to express breastmilk in a restroom;

b.      Ms. Lampkins was not given reasonable break time each time she needed to express milk;

16

      c.     Ms. Lampkins was not provided a place to express breast milk that was shielded from view from coworkers and the public because she had to express milk in a room with a surveillance camera; and

      d.     Ms. Lampkins was not provided a place to express breast milk free from intrusion from coworkers and the public as she was constantly interrupted while she attempted to express milk in the office.

WHEREFORE Plaintiff Autumn Lampkins respectfully requests this Court:

A.     Enter judgment in her favor jointly and severally against Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and Defendant KFC Corporation;

B.     Award her special damages, including lost wages, as she can prove, and liquidated damages;

C.     Award her costs and attorney's fees;

D.     Award her pre- and post-judgment interest;

E.     Fine Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and Defendant KFC Corporation, for their violations of the FLSA; and

F.     Grant such other relief as the Court deems appropriate.

**CURLEY, DODGE & FUNK, LLC**

  /s/ Patrick C. Gallagher
Patrick C. Gallagher, Esq. (DE Bar 5170)
250 Beiser Boulevard, Suite 202
Dover, Delaware  19904
(t) (302) 674-3333
(f) (302) 674-3335
pgallagher@curleydodgefunk.com
*Attorney for Plaintiff*

Date:  July 28, 2016