## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AUTUMN LAMPKINS,          )
                                           )
         Plaintiff,          )
                                         )      C.A. No. 1:16-cv-00647-GMS
         v.                )
                                         )      JURY TRIAL DEMANDED
MITRA QSR, LLC, MITRA QSR KNE, LLC,  )
and KFC CORPORATION,        )
                                         )
         Defendants.      )

## AMENDED COMPLAINT

### The Parties & Jurisdiction

1.      Plaintiff Autumn Lampkins ("Ms. Lampkins") is a resident of Wyoming, Kent County, Delaware.

2.      Defendant Mitra QSR, LLC, is a Texas corporation that conducts business in the State of Delaware.  Upon information and belief, Mitra QSR, LLC's, principal place of business is located at 18900 Dallas Parkway #125, Dallas, Texas 75287.  Upon information and belief, Mitra QSR, LLC, employs more than 500 employees nationwide.

3.      Defendant Mitra QSR KNE, LLC, is a Texas corporation that conducts business in the State of Delaware.  Upon information and belief, Mitra QSR KNE, LLC's, principal place of business is located at 18900 Dallas Parkway #125, Dallas, Texas 75287.  Upon information and belief, Mitra QSR KNE, LLC, employs more than 500 employees nationwide.

4.      Defendant KFC Corporation is a Delaware corporation that conducts business in the State of Delaware.  Upon information and belief, KFC Corporation's address is 1900 Colonel Sanders Lane, Louisville, KY  40213.  Upon information and belief, KFC Corporation employs more than 500 employees nationwide.

5.     The three Defendants, individually and/or collectively, operate KFC Restaurants in Kent County Delaware.  Specifically, the Defendants, individually and/or collectively, operate a KFC restaurant located at 344 Walmart Drive, Camden, Delaware 19934 (the "Camden Store"), and a KFC restaurant at 223 S. DuPont Highway, Dover, Delaware 19901 (the "Dover Store").

6.     Ms. Lampkins was employed by Mitra QSR, LLC and/or Mitra QSR KNE, LLC (collectively, "Mitra") to work in the Camden Store and, subsequently, the Dover Store.

7.     Upon information and belief, KFC Corporation exercises sufficient control over its franchisees, including the Mitra entities, through its policies and contractual requirements that KFC Corporation is, in effect, a principal of its agent-franchisees, such as the Mitra entities, a single-employer of the Mitra entities' employees, and/or a joint-employer of the Mitra entities' employees.  KFC Corporation's exercise of control renders it liable for the Mitra entities' violation of state and federal employment laws.

8.     Ms. Lampkins submitted a Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC") against all three Defendants on October 6, 2015.  The Charge against the two Mitra entities was assigned Charge Number 530-2016-00246.  The Charge against KFC Corporation was assigned Charge Number 530-2016-00908.

9.     The EEOC dismissed the Charge against KFC Corporation through a letter to Ms. Lampkins dated April 29, 2016.  The stated reason was:  "The evidence submitted reveals that you were an employee for Mitra QSR, not for Respondent" KFC Corporation.  On May 2, 2016, the EEOC sent Ms. Lampkins a Dismissal and Notice of Rights with respect to her claim against Defendant KFC Corporation.  This Dismissal and Notice of Rights included a "Notice of Suit Rights" informing Ms. Lampkins of her right to bring a lawsuit against KFC Corporation within

90 days of the date she received the Dismissal and Notice of Rights for the violations of Title VII of which she complained.

10.     On July 1, 2016, Ms. Lampkins requested a Right-to-Sue Letter from the EEOC for the Charge against the two Mitra entities.  The basis for the request for the Right-to-Sue Letter was that more than 180 days had elapsed since the Charge was submitted to the EEOC.

11.     The Right-to-Sue Letter for the Charge against the two Mitra entities was mailed by the EEOC on or about July 5, 2016.

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

### KFC Corporation's Control Over & Involvement With Mitra Entities

13.     KFC Corporation and the Mitra entities are responsible, both directly and jointly, for the operation of all KFC restaurants mentioned in this Complaint, and for the policies, practices, and conduct at issue in this case.

14.     Throughout the relevant period, KFC Corporation and the Mitra entities, acting in a joint venture or as joint employers, have formulated, approved, controlled, and engaged in the improper practices described in this Complaint and thus are jointly responsible for these practices.

15.     Throughout the relevant period, KFC Corporation and the Mitra entities have been an integrated enterprise with inter-related operations, systems, policies, practices, and labor relations.

16.     Throughout the relevant period, KFC Corporation and the Mitra entities served as each other's agents and worked in concert to accomplish the actions pled here.

17.     Throughout the relevant period, KFC Corporation has been actively engaged in the day-to-day operation and management of business operations at all of its franchisee-owned restaurants.

18.     KFC Corporation exercised and retained significant control over and involvement with its franchisees, including the Mitra entities, such that the Mitra entities were agents of the principal, KFC Corporation.   KFC Corporation's control and involvement also rendered KFC Corporation a "single-employer" or "joint-employer" of Ms. Lampkins with the Mitra Defendants.   Either through a principal-agency theory, a "single-employer" theory, and/or a "joint-employer" theory, Defendant KFC Corporation exercised control and/or involvement such that Defendant KFC Corporation is liable for the Mitra Defendants' violation of state and federal employment laws with respect to Ms. Lampkins.

19.     KFC Corporation provides information regarding the franchisor-franchisee relationship on its website, www.kfcfranchise.com.[1]   With respect to an individual or buyer purchasing a franchise of KFC stores, KFC Corporation:

a.   Must review the transaction of the sale of a franchise prior to consummation of the purchase.

b.   Franchisees must pay 5% of gross revenues in royalties to KFC Corporation and 5% of gross revenues to KFC Corporation for advertising.

c.   KFC Corporation requires franchisees attend a training session that must be passed to KFC Corporation's satisfaction.

d.   KFC Corporation conducts at least two audits of its franchisees, either directly or through a third-party, to monitor franchisee performance.

---

[1] Information retrieved from www.kfcfranchise.com/faqs-qsr-restaurant.php on 10/26/16.

4

e.  KFC Corporation also requires franchisees to "use the KFC supported MERIT back-of-house operating platform.  [Franchisees] must prepare and keep detailed records regarding all sales and other financial aspects of [their] restaurant operations.  [Franchisees] may also be required to submit reports of product mix, hourly and part-day sales and other reports as may be determined by KFC."

20.    On another part of the www.kfcfranchise.com website, entitled KFC Franchise Opportunities, KFC Corporation states:[2]

> Another important attribute of a quality franchise system is having a proven system of franchisee training and support.  KFC franchise opportunities include a complete training and support program to assist you as you open and operate your business.  You are taught perfect product preparation, how to manage inventory, how to hire and train your staff and how to organize your office to deliver optimum results. . . . You have to practice hands-on management, you have to build a high performing team and you have to be dedicated to great execution for each and every customer.  The KFC system is designed to share best practices with you, enabling you to compete.

21.    On another part of www.kfcfranchise.com, KFC Corporation states that it will provide "ongoing" business support for its franchisees.[3]

22.    KFC Corporation's 2014 License Disclosure Document ("LDD") for KFC restaurants provides information regarding what is expected of franchisees in their relationship with KFC Corporation.  The entire LDD, along with its attachments, which is voluminous, is incorporated herein by reference.[4]  The LDD demonstrates the level of involvement and control KFC Corporation exercises over its franchisees.  By way of example, but without limitation, the LDD provides:

---

[2] Information retrieved from www.kfcfranchise.com/articles/KFC-Franchise-Opportunities-articles.php on 10/26/16.

[3] Information retrieved from www.kfcfranchise.com/process-fried-chicken-business.php on 10/26/16.

[4] The LDD was retrieved from http://kfcfdd.blogspot.com/ on 10/26/16.

a. KFC restaurants operated by franchisees must meet certain specifications approved by KFC Corporation.  (p. 4)

b. Franchisees purchase certain equipment for their restaurants, including the MERIT system, which is a technology system to be used at all or nearly all KFC restaurants. (p. 6)

c. KFC Corporation has an affiliate franchisees may use for assistance with site selection, negotiations related to buying or leasing space for the restaurant, construction feasibility, project feasibility, design, permitting, and construction management.  (p. 20-21)

d. Franchisees must pay 5% of their gross revenues to KFC Corporation and an additional 5% of their gross revenues to an affiliate or affiliates of KFC Corporation for advertising.  (p. 22)

e. "Equipment, inventory, advertising materials, training materials, uniforms, packaging, computer hardware, insurance, all food and beverage ingredients, as well as products that are used or sold at [franchisee's] KFC outlet must be purchased from suppliers (manufacturers and distributors) approved by" Defendant KFC Corporation. The LDD identifies certain sole-source suppliers franchisees must use.  (p. 27-29)

f. KFC Corporation requires franchisees to purchase "all fixtures, furnishings, equipment, décor and signs" as KFC Corporation requires, but the franchisee cannot install those items without KFC Corporation's approval.  All work at the franchisee's restaurant must meet KFC Corporation's standards.  (p. 30)

g.  If a franchisee seeks to use a supplier not approved by KFC Corporation, the franchisee must seek approval, and the proposed supplier may have to provide samples of products the franchisee wishes to use.  (p. 30)

h.  Any advertising marketing/materials a franchisee seeks to use must be approved by KFC Corporation.  (p. 30)

i.  KFC Corporation has a non-mandatory co-op that, along with affiliated companies, aggregates and/or conducts purchasing activities for food, packaging, and equipment at KFC restaurants.  (p. 30-31)

j.  KFC Corporation's parent company offers loans to certain franchisees for construction, acquisition, and renovation of KFC restaurants.  (p. 34-38)

k.  KFC Corporation provides franchisees with a "Standards Library" that "contains [KFC Corporation's] mandatory and suggested specifications; standards and operating procedures; and, may also include other information regarding [franchisees] obligations under the" franchise agreement.  (p. 39)

l.  KFC offers franchisees the use of a "web-based hiring management system, "Hiring Zone" ("HMS"), which [KFC Corporation] uses in its company-operated locations and which is designed to improve the recruiting and selection of restaurant employees."  Franchisees must pay to use HMS.  (p. 41)

m.  "[Franchisees] must keep books and records in a form satisfactory to [KFC Corporation].  [Franchisees] must prepare complete records regarding all sales at [their] KFC outlet, as well as all financial, operating, marketing and other aspects of [their] KFC outlet.  [They] must maintain an accounting system that accurately reflects all aspects of the business at [their] KFC outlet, including books of account;

tax returns, daily reports; statement of gross revenues; profit and loss statements; and balance sheets. [They] must also submit to [KFC Corporation] any other reports that [it] may reasonably request concerning the business conducted at [franchisees'] KFC outlet." (p. 41)

n. Franchisees are required to use the MERIT system, which includes cash register hardware systems and a back-of-house system. The cost of the required MERIT system is $16,000 to $23,000 per restaurant. KFC Corporation has "independent access to the information that will be generated or stored on [franchisees'] . . . MERIT system. There is no contractual limit on [KFC Corporation's] right to access this information. [Franchisees] must pay [KFC Corporation] a monthly fee based upon the costs for internal support services that are provided to all MERIT restaurants; and, [franchisees] must also sign and pay for a hardware maintenance contract with a [KFC Corporation]-approved hardware maintenance provider and any other approved vendors required by [KFC Corporation] for those systems." (p. 41)

o. KFC Corporation requires training of franchisees, and at KFC Corporation's direction, employees of the franchisee must attend training put on by KFC Corporation at a place designated by KFC Corporation. All travel and training is at the franchisees' expense. (p. 42-43)

p. Franchisees must also sign an agreement with a co-op affiliated with KFC Corporation that requires franchisees to pay an additional 4.5% of their gross revenues to this co-op for national advertising. KFC Corporation has the "sole right to hire and fire the advertising and public relations agencies retained by the" co-op. In essence KFC Corporation directs all marketing and advertising for all KFC

franchises.  This is in addition to requiring franchisees to spend 0.5% of their gross revenues for local advertising (but only in a manner approved by KFC Corporation).  If the 0.5% is not used for marketing, a franchisee may have to pay that amount to the co-op.  Finally, any advertising materials sought to be used by a franchisee must be approved by KFC Corporation.  (p. 47-48)

q.  To relocate a KFC restaurant, a franchisee must obtain prior written approval from KFC Corporation.  (p. 50)

r.  "[Franchisees] must comply with the Standards Library which can be periodically changed."  (p. 54)

s.  Franchisees' "manager and other employees must complete training programs that [KFC Corporation] may require; and, [the franchisees] must pay the expenses for persons attending.  [The franchisee] may be required to enter into agreements with [its] employees regarding secrecy of [KFC Corporation's] confidentiality information; and [the franchisee] must comply with the confidentiality and non-competition provisions of the franchise agreement."  (p. 54)

t.  Franchisees must sell certain products designated by KFC Corporation.  If a franchisee wishes to sell other products, it must seek permission from KFC Corporation.  (p. 54)

u.  In the attachments to the KFC LDD, KFC Corporation provides a Form 76[5P] Kentucky Fried Chicken Franchise Agreement.  Upon information and belief, this document is the primary agreement between franchisors and franchisees and governs that relationship.  It shows significant involvement of KFC Corporation in the operation of franchises.  For example:

i. Franchisees must "strictly comply with all reasonable standards, specifications, process, procedures, requirements, and instructions of [KFC Corporation] regarding the operation of the business which now exist or may be established from time to time." The Franchisee must, *inter alia*, make sure there exists a manager of the franchise, all relevant training is conducted, all marketing materials are approved by KFC Corporation, there are enough employees and supplies to meet anticipated demand, and all products authorized by KFC "are prepared at the Outlet for sale to customers at the Outlet." (p. 6)

ii. KFC Corporation supplies franchisees with "a Confidential Operating Manual, and the Franchisee will abide by and may rely upon the Confidential Operating Manual." (p. 7)

iii. KFC Corporation may enter onto franchisees' property at any time during business hours to inspect the restaurant to make sure franchisees are complying with all of KFC Corporation's requirements and standards. KFC Corporation can "collect samples at any other facilities" controlled by the franchisee. (p. 8)

iv. Franchisees must follow KFC Corporation's specifications and processes regarding the physical appearance of the restaurant, and KFC Corporation can require franchisees to remodel their restaurant.

v. KFC Corporation will provide business advice and training to franchisees.

vi. KFC Corporation requires financial records be maintained, and KFC Corporation can request, review, audit, and/or inspect any of those records for

a period of three years following the end of the franchise agreement which is typically 20 years in length.

vii.   KFC Corporation sets standards for the equipment and supplies to be used by franchisees.

23.   As noted above, the LDD provides franchisees must comply with the Standards Library.[5]  The Standards Library is voluminous but is incorporated herein by reference.  The Standards Library demonstrates the level of involvement and control KFC Corporation exercises over its franchisees.   By way of example, but without limitation, the Standards Library provides:

a.  The method of how to cook nearly every item on KFC's menu.  These methods are detailed to the level of how many times, for example, a "Colonel's Crispy Strip" should be dipped in breading before being cooked.

b.  The specifications for various pieces of equipment to be used in the restaurants, including how to use the equipment, how to clean the equipment during the day and at the end of each day, and how to troubleshoot the equipment.

c.  The details of how employees should dress, what kind of jewelry they may/may not wear, what kind of facial hear is/is not permitted, and generally how employees should present themselves to the public.

d.  The method to administer corrective action/discipline to employees and what items to keep in an employment file.

e.  Standards on cash handling, alarm systems, staffing needs, emergency situations, cleaning, food safety, friendly service, and pest prevention.

---

[5] The following information from the Standards Library came from http://downloads.jrninc.com/standards/standards.html, which was accessed between 10/26/16 and 10/30/16.

f.  Information on how to administer the job application process, including how to have employees fill out the "A-Team Assessment" required of applicants and how to check applicants' references.

g.  Information on how to recruit potential employees and making the restaurant "Recruitment Ready."

h.  There is substantial information on the required MERIT system, including how to set up payroll for employees in MERIT, how to order from vendors integrated into MERIT, how to manage inventory in MERIT, how to develop accountability for shift managers, how to use the "Thunderbird" email system, and how employees should clock in and clock out so they are paid appropriately.

i.  The ideal schedule for various employees and where those employees should stand/work/be stationed within the restaurant given various numbers of employees on the shift.  The Standards Library also provides forms for determining the availability of employees to work and for time off requests.

j.  Self-evaluations for restaurants and evaluation forms for representatives from KFC Corporation are provided.  Upon information and belief, franchises were visited approximately quarterly by representatives from Defendant KFC Corporation.

k.  Guidelines/evaluations on how to clean restaurants on a daily and weekly basis.

l.  Information on how to train employees for and operate the KFC buffet.

24.    Defendant KFC Corporation is a subsidiary and/or affiliate of Yum! Brands. "How We Win Together Principles" reflects the corporate values of Yum! Brands.  According to Yum! Brands' 2015 Corporate Social Responsibility Report, "[t]his unique set of principles

guides all aspects of our associates' daily work lives, professional and personal development and customer interactions."[6]

25.     According to Yum! Brands' 2016 Code of Conduct, which is incorporated herein by reference, the Company's stated policy includes, *inter alia*:

a.  "deal[ing] fairly with employees;

b.  "provid[ing] equal opportunity for all in recruiting, hiring, developing, promoting and compensating without regard to race, religion, color, age, gender, disability, genetic information, military or veteran status, sexual orientation, gender identity, citizenship, national origin, or other legally protected status; and

c.  "maintain[ing] a professional, safe and discrimination-free work environment."

### Ms. Lampkins' Initial Hiring & The Camden Location

26.     Ms. Lampkins was hired by Mitra to begin work as an Assistant Restaurant Manager on or about December 29, 2014.  Her pay was supposed to be $30,000 on an annual basis.  Her formal employment began at the Camden Store for training purposes.  After training, she was told she would be transferred to a restaurant in Smyrna, Delaware.

27.     Ms. Lampkins' son was born on August 7, 2014, prior to beginning her employment with Mitra.  Ms. Lampkins made the decision to breastfeed her son.  Breastfeeding is a female attribute that occurs because and after a woman is pregnant.

28.     Ms. Lampkins was hired by the District Manager/Coach Lori Davis ("Ms. Davis") who was aware that Ms. Lampkins was breastfeeding.  Ms. Davis assured Ms. Lampkins breastfeeding would not be a problem.  Ms. Davis further relayed they had another manager employed who was also breastfeeding.

---

[6] Retrieved from www.yumcsr.com/people/hwwt2.asp on 10/31/16.

29.     At the Camden Store, Ms. Lampkins had to ask permission to go pump breastmilk because she was in training.  At the Camden Store, Ms. Lampkins worked a 10-hour shift, and she typically only got to pump once per shift rather than the recommended once every two hours.

30.     When working for the original District Manager/Coach Lori Davis, Ms. Lampkins was instructed to go to the restroom to pump and/or express breast milk.  The restroom at the Camden Store was a single-stall facility.  When she used it to pump, she tied up the restroom for approximately 15 to 20 minutes.

31.     After a couple of weeks of tying up the restroom, Ms. Lampkins was instructed to stop using the restroom to pump and to begin using the manager's office.  The manager's office, however, had a surveillance camera.

32.     Defendants' answer to alleviating her privacy concerns was for Ms. Lampkins to bring a cover and express breastmilk under the cover.  She was also told to pump "away from the camera."  Ms. Lampkins reluctantly complied out of fear of losing her job.  But Ms. Lampkins was concerned her breasts would still be viewable on the camera.

33.     Other employees would walk in and out of the manager's office while Ms. Lampkins was pumping breastmilk.  Those individuals were another Assistant Manager, Bo O'Connell, Joanna Butz, Nakia Anderson, and Joy Rhinehardt, who was the General Manager of the Camden Store.  Everyone came in the office while Ms. Lampkins was expressing breast milk to ostensibly check the "speed of service" statistics.

34.     Bo O'Connell, in particular, would enter the office whenever he pleased without knocking before entering.  He used his key to open the locked door behind which Ms. Lampkins was expressing breastmilk.

35.     Ms. Lampkins recalls the males being more bothered by her pumping breastmilk than the females.  Bo O'Connell told her she was not to pump at work because she should be doing this at home.  Ms. Lampkins complained to Joy Rhinehardt who told Mr. O'Connell that he was wrong in his comment and needed to let Ms. Lampkins pump.

36.     Ms. Lampkins' feedback forms from her training at the Camden Store indicated she was doing well.  The only negative feedback was that she was behind on the training.  Ms. Lampkins was trained on the floor rather than in a training class.  Such training would be interrupted if, for example, another employee called out or did not come to work.  If that occurred, the trainers had to work rather than take time to train Ms. Lampkins.  Thus, if Ms. Lampkins was behind on her training, it was because her trainers had not taught or showed her a particular skill; it was not the fault of Ms. Lampkins.  The feedback forms support this in that they often indicate it was the responsibility of Ms. Lampkins and/or her supervisor, Joy Rhinehardt, to fill in the content gap.

**Ms. Lampkins' Demotion & Transfer to the Dover Location**

37.     The District Manager/Coach position changed just prior to the end of Ms. Lampkins' training, and Ms. Davis was no longer in that role.  The new District Manager was Emily Martin.

38.     At the end of training, Emily Martin told Ms. Lampkins she was going to move Ms. Lampkins to the position of Shift Supervisor at the Dover Store rather than sending her to the Smyrna, Delaware, store as the assistant manager, pursuant to the original plan.  This was a demotion and was not at Ms. Lampkins' request.  Ms. Lampkins never indicated the Camden Store was "too much for her."

39.     As a Shift Supervisor, she was charged with overseeing or managing a shift at the Dover Store.   In connection with her demotion, Ms. Lampkins' pay decreased from approximately $10.49 or $10.50 per hour for approximately 50 hours per week at the Camden Store to $10.00 per hour for approximately 30-40 hours per week at the Dover Store.

40.     Emily Martin explicitly told Ms. Lampkins that her demotion to Shift Supervisor was because she was pumping breastmilk while at work. Emily Martin explained it would be easier because the Dover store was a "base store" with less volume and less responsibilities, making it easier to go into the office to pump.  She told Ms. Lampkins that once Ms. Lampkins completed breastfeeding, she could move to another location as the Assistant Manager.

41.     Lisa Rhinehardt was Manager of the Dover location and, upon information and belief, is the step-daughter of Joy Rhinehardt.

42.     Lisa Rhinehardt had previously tried to breastfeed her recently-born child, but Lisa Rhinehardt told Ms. Lampkins she ceased breastfeeding altogether because she could not simultaneously express breastmilk at work and keep up with the responsibilities of her job.

43.     At the Dover Store, it was apparent when Ms. Lampkins was pumping because she would have to leave her post to pump.  She would also typically announce she was going to pump.

44.     When Ms. Lampkins first arrived at the Dover Store, there were no problems.  As time progressed, however, things worsened.  Specifically, three problems occurred.

45.     First, she was unable to pump at the store, causing her embarrassment, pain, and a decrease in breastmilk supply for her son.  At the Dover Store, she only got to pump once during an 8-hour shift if she was lucky.  Indeed, she did not get to pump at all on some days while working at the Dover Store.

a.      When the store became busy at night, Ms. Lampkins was unable to pump which caused her breasts to become engorged and lactate through her shirt. This happened on one or two occasions. Ms. Lampkins attempted to cover up the leakage to save her from embarrassment by going to the restroom and putting water on her shirt.

b.      Ms. Lampkins also suffered a clogged milk duct, which was very painful.

c.      Failure to pump breastmilk, decreases the supply, which was incompatible with her son being able to eat every two to three hours. Thus, Ms. Lampkins had to resort to giving her son formula sooner than she wanted to since she was unable to pump breastmilk at work.

46.     Second, Ms. Lampkins was treated differently, not supported by management, and/or punished because of her need to pump.

a.      Ms. Lampkins was a Shift Supervisor, and she allowed all of her employees to take a break, whether they were legally entitled to a break or not. Only after others took their breaks did she take a break. On some days, this backfired, and she was unable to pump at all. Ms. Lampkins asked Lisa Rhinehardt to briefly extend the shifts of one particular employee so Ms. Lampkins could build in some time to pump, but Lisa Rhinehardt refused to do so. Lisa Rhinehardt's purported reason was that the specific employee was a minor who had to go to school the next day. While the employee was a minor, the extended shift requested by Ms. Lampkins would not have violated any laws pertaining to the work of minors.

b.      Ms. Lampkins' subordinates told her that if she went to the office to pump, they would walk out of the restaurant. One of these individuals was Destiny O'Connell, who is Bo O'Connell's sister. Ms. Lampkins reported these threats and the

17

fact that she was unable to pump to Lisa Rhinehardt.   Ms. Rhinehardt's solution, however, was to cut Ms. Lampkins' hours down to 20 hours per week.   Lisa Rhinehardt made no efforts to construct a schedule that would alleviate the problem or talk to the subordinates who were causing problems.

      c.     At least one other Shift Supervisor was hired after Ms. Lampkins was constructively discharged.   Upon information and belief, that Shift Supervisor was given more hours of work per week than Ms. Lampkins.

47.     Third, Ms. Lampkins' privacy was not honored and/or protected.

      a.     Initially, Ms. Lampkins used a corner of the office at the Dover Store to express breastmilk as it was out of view of the surveillance camera.   Ms. Rhinehardt told Ms. Lampkins a customer complained he or she had seen Ms. Lampkins' breast through a window in the office while she was pumping.   Ms. Lampkins always wore a cover when she was pumping, and Ms. Lampkins doubts the veracity of Ms. Rhinehardt's claim.   Ms. Lampkins was subsequently told she had to face the camera in the office while she pumped so that others could not see her.

      b.     One on occasion, Ms. Lampkins covered the window on the door in the office at the Dover restaurant for added privacy.   The window on the door already contained sheets of paper known as "praises" from customers.   These praises were stuck to the window, but there was a gap where someone could still through the window.   Ms. Lampkins printed out another "praise" for a co-worker to use to cover up the last remaining open space of the window.   By the next day, the "praise" she put up had been removed while all of the other "praises" were left intact on the window.

      c.      If the staff at the Dover restaurant needed something while Ms. Lampkins was pumping, they would knock on the door or talk through the door.  If it was a female staff member in the Dover restaurant who needed a personal item, such as a purse, Ms. Lampkins would allow her to enter the office to retrieve what she needed.  Ms. Lampkins never consented to allow a male staff member to enter the office while she was pumping.

      d.      Despite her failure to allow a male staff member to enter the office while she was pumping, on one occasion, a male cook entered the office while Ms. Lampkins was pumping, without knocking or identifying himself, to ask her how much chicken he needed to cook.  Ms. Lampkins replied she did not know, and he needed to ask Destiny O'Connell.  This led to a text message from Ms. Rhinehardt saying Ms. Lampkins was wrong to not stop pumping and go out and instruct the cook because Destiny O'Connell was not a manager.

      e.      Ms. Lampkins was not provided with a space to express her breastmilk that was free from intrusion and obscured from the view of others.

48.      Ms. Lampkins was led to believe in her training that the footage from the surveillance cameras at both locations could be viewed from the Mitra entities' headquarters in Texas.

## Ms. Lampkins' Constructive Discharge

49.      Ms. Lampkins was "written up" on only one occasion.  She allegedly left loose trash under a bag of trash inside the restaurant.  It was later learned the trash had been left by a different shift on which Ms. Lampkins was not even working.  In response, Ms. Lampkins requested, in writing, more training from Ms. Rhinehardt.  The training was not provided.

50.     Much of Lisa Rhinehardt's animus toward Ms. Lampkins stemmed from the fact that Ms. Lampkins continued to prioritize breastfeeding when Lisa Rhinehardt was unable to do so while keeping her job.

51.     In the Spring of 2015, Ms. Lampkins began looking for a new job because of the ongoing harassment relating to her attempts to pump her breastmilk at work and because her relationship with Lisa Rhinehardt deteriorated.

52.     Ms. Lampkins' relationship with Lisa Rhinehardt deteriorated in the following ways:

   a.     Ms. Rhinehardt sent text messages to Ms. Lampkins complaining;

   b.     Lisa Rhinehardt was not providing any support to Ms. Lampkins when Ms. Lampkins' subordinates prevented Ms. Lampkins from pumping; and

   c.     Ms. Lampkins had been written up and, in response, requested more training, which Ms. Rhinehardt refused to provide.

53.     In April 2015, Ms. Lampkins found a jacket which had been left by a customer of the restaurant.  She threw it in a pile with her belongings, and she inadvertently took the jacket home.  Ms. Rhinehardt called Ms. Lampkins upset.  Ms. Lampkins explained taking the jacket was an accident, but Ms. Rhinehardt said she would call Emily Martin, the District Manager/Coach.

54.     Ms. Lampkins heard from a co-worker that Lisa Rhinehardt was going to use that mistake to terminate Ms. Lampkins.  The jacket incident was the last straw.

55.     All of the foregoing harassment, text message complaints, write ups, complaints, and accusations became intolerable to Ms. Lampkins continued employment with Defendants. Likewise, they were more than any reasonable person should have to endure in an employment

relationship.  Therefore, on May 1, 2015, Ms. Lampkins quit her employment with Defendants in what amounted to a constructive discharge.

56.     When she began training, Ms. Lampkins was provided with a large notebook full of training materials.  Ms. Lampkins does not recall ever receiving a copy of an Employee Handbook.  Moreover, to the best of her knowledge, information, and belief, she did not have contact information for anyone at the Defendants' headquarters to whom she could complain about the harassment.  Other than the incidents noted above about which Ms. Lampkins complained, she did not report the harassment because she feared she would lose her job if she reported it.

57.     In addition to lost wages, Ms. Lampkins endured harassment and mistreatment, which caused her emotional distress and disruption of her life.

## COUNT I – GENDER DISCRIMINATION

58.     Plaintiff incorporates all foregoing allegations as if they are stated in this Count in full.

59.     Ms. Lampkins was discriminated against and/or treated differently in her employment with Defendants because, as a female, she had to express her breastmilk while working for Defendants.

60.     Ms. Lampkins was qualified for the job as evidenced by the lack of significant "write up's" and discipline against her.

61.     She suffered at least four adverse employment actions as a result of this discrimination

        a.      She was initially forced to pump her breastmilk in a restroom at the Camden Store in violation of federal law.  Only after it inconvenienced Defendants was

21

she "allowed" to pump in an office in front of a video surveillance camera, where she had little to no privacy;

      b.      She was demoted to the Dover Store, with a different title, a lesser rate of pay, and she was specifically told she was demoted because she was breastfeeding;

      c.      At the Dover Store, she was still forced to express breastmilk in an office in front of a video surveillance camera, where she had little to no privacy; and

      d.      Because her breastfeeding was inconvenient to Defendants, she received complaints from her supervisor via text message, she was written up by her superior, and, ultimately, she was going to be terminated because she mistakenly took home a jacket that a customer had left at the store one night.  As explained above in Paragraph 42, all of these events, when coupled with the harassment she endured, led her to quit in what amounts to a constructive discharge.

62.      These adverse employment actions imposed burdens upon Ms. Lampkins that would not be imposed upon male employees.

63.      This willful, intentional, and unlawful gender discrimination violates the laws and regulations of both the United States, including, without limitation, 42 U.S.C. § 2000e, *et seq.*, and the State of Delaware, including, without limitation, 19 Del. C. § 710, *et seq.*

WHEREFORE Plaintiff Autumn Lampkins respectfully requests this Court:

A.      Enter judgment in her favor jointly and severally against Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and Defendant KFC Corporation;

B.      Award her special damages, including lost wages, front and back, as she can prove, compensatory damages, and punitive damages;

C.      Award her costs and attorney's fees;

D.      Award her pre- and post-judgment interest;

E.      Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to cease and desist from discriminating against women and breastfeeding employees;

F.      Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to comply with state and federal laws regarding breastfeeding employees; and

G.      Grant such other relief as the Court deems appropriate.

## COUNT II - HARASSMENT

64.     Plaintiff incorporates all foregoing allegations as if they are stated in this Count in full.

65.     Ms. Lampkins was discriminated against and/or treated differently because, as a female, she had to express her breastmilk while working for Defendants.

66.     Ms. Lampkins had to endure pervasive and regular harassment from her managers and co-workers when, among other things:

a.      She was initially forced to pump in a restroom in violation of federal law;

b.      Only after it inconvenienced Defendants was she "allowed" to pump in an office in front of a video surveillance camera, where she had little to no privacy;

c.      She was frequently interrupted by superiors and co-workers pumping in that office;

d.      She was told not to pump in the office by a male co-worker;

e.      She was demoted to the Dover Store, with a different title and a lesser rate of pay, and she was specifically told she was demoted because she was breastfeeding;

23

     f.     At the Dover Store, she was still forced to express breastmilk in an office in front of a video surveillance camera, where she had little to no privacy;

     g.     Her subordinate employees refused to allow her to express breastmilk and hindered her ability to do so by threatening to walk off the job if she did so.  After Ms. Lampkins complained to her supervisor about insubordination due to her need to express breastmilk, Ms. Lampkins' hours were cut;

     h.     Her supervisor complained to her about not being available to answer questions from other employees when she was in the office expressing breastmilk,

     i.     She received write ups and text message complaints from her supervisor; and

     j.     She was accused of stealing a jacket that a customer had left behind in the Dover Store.

67.     This harassment by her managers and co-workers detrimentally affected her in that, among other things:

     a.     She was demoted with a corresponding decrease in the rate of pay and, ultimately, hours;

     b.     She suffered physical pain as a result of being delayed and/or prevented from expressing breastmilk;

     c.     She suffered a clogged milk duct;

     d.     Her supply of breastmilk dried up prematurely;

     e.     She leaked breastmilk onto her shirt at work causing her embarrassment and humiliation;

24

f.      She had to continue working in clothes soiled by leaking breastmilk causing her embarrassment and humiliation;

g.      She had to self-consciously express breastmilk in front of a surveillance camera, which caused embarrassment;

h.      She was interrupted while she expressed breastmilk which caused embarrassment;

i.      She suffered embarrassment, humiliation, emotional distress, and disruption to her life because of Defendants' actions; and

j.      She was constructively discharged and was unable to find comparable employment for a period of time after May 2015.

68.    The harassment by her managers and co-workers would detrimentally affect a reasonable person for all of the reasons stated herein, as the harassment and its results would cause decreased wages, pain, drying up, lost wages, and embarrassment and humiliation to a reasonable person.

69.    The harassment of Ms. Lampkins by Defendants' managers and employees was willful and intentional.

70.    Despite Ms. Lampkins complaining about these situations to her managers and/or supervisors and asking for, among other things, more training and support, no meaningful remedial action was taken with respect to the harassment.

71.    This willful, intentional, and unlawful gender-based harassment and discrimination violates the laws and regulations of both the United States, including, without limitation, 42 U.S.C. § 2000e, *et seq.*, and the State of Delaware, including, without limitation, 19 Del. C. § 710, *et seq.*

25

WHEREFORE Plaintiff Autumn Lampkins respectfully requests this Court:

A.      Enter judgment in her favor jointly and severally against Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and Defendant KFC Corporation;

B.      Award her special damages, including lost wages, front and back, as she can prove, compensatory damages, and punitive damages;

C.      Award her costs and attorney's fees;

D.      Award her pre- and post-judgment interest;

E.      Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to cease and desist from discriminating against women and breastfeeding employees;

F.      Order Defendants Mitra QSR, LLC, Mitra QSR KNE, LLC, and KFC Corporation to comply with state and federal laws regarding breastfeeding employees; and

G.      Grant such other relief as the Court deems appropriate

**COUNT III – VIOLATION OF FAIR LABOR STANDARDS ACT ("FLSA")**

72.      Plaintiff incorporates all foregoing allegations as if they are stated in this Count in full.

73.      The FLSA, as amended, requires that an employer allow a breastfeeding employee to take "reasonable break time . . . to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk."  Further, the employer must prove "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."  29 U.S.C. § 207(r).

74.     The FLSA applies to Defendants and to Ms. Lampkins' employment with Defendants.

75.     Defendants, through their agents and/or employees, willfully violated the relevant portions of the FLA in the following ways:

a.     Ms. Lampkins was initially forced to express breastmilk in a restroom;

b.     Ms. Lampkins was not given reasonable break time each time she needed to express milk;

c.     Ms. Lampkins was not provided a place to express breast milk that was shielded from view from coworkers and the public because she had to express milk in a room with a surveillance camera; and

d.     Ms. Lampkins was not provided a place to express breast milk free from intrusion from coworkers and the public as she was constantly interrupted while she attempted to express milk in the office.

WHEREFORE Plaintiff Autumn Lampkins respectfully requests this Court:

A.     Enter judgment in her favor jointly and severally against Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and Defendant KFC Corporation;

B.     Award her special damages, including lost wages, as she can prove, and liquidated damages;

C.     Award her costs and attorney's fees;

D.     Award her pre- and post-judgment interest;

E.     Fine Defendant Mitra QSR, LLC, Defendant Mitra QSR KNE, LLC, and

Defendant KFC Corporation, for their violations of the FLSA; and

     F.     Grant such other relief as the Court deems appropriate.

          **CURLEY, DODGE & FUNK, LLC**

          /s/ Patrick C. Gallagher
          Patrick C. Gallagher, Esq. (DE Bar 5170)
          250 Beiser Boulevard, Suite 202
          Dover, Delaware  19904
          (t) (302) 674-3333
          (f) (302) 674-3335
          pgallagher@curleydodgefunk.com

Date:  October 31, 2016          *Attorney for Plaintiff*