# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

AUTUMN LAMPKINS, :
                         :
          Plaintiff, :
                         :
      v.                  :      Civil Action No. 16-647-CFC
                         :
MITRA QSR KNE, LLC, :
                         :
         Defendant. :

---

Patrick C. Gallagher, Raeann Warner, JACOBS & CRUMPLAR, P.A., Wilmington, Delaware

*Counsel for Plaintiff*

Richard A. Barkasy, Daniel M. Pereira, SCHNADER, HARRISON, SEGAL & LEWIS LLP, Wilmington, Delaware; Jo Bennett, Samantha Banks, SCHNADER, HARRISON, SEGAL & LEWIS LLP, Philadelphia, Pennsylvania

*Counsel for Defendant*

## **MEMORANDUM OPINION**

June 4, 2019
Wilmington, Delaware

_Cōlm F. Cōnnolly_

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

The Court held a five-day jury trial in this employment discrimination case filed by Plaintiff Autumn Lampkins against Defendant Mitra QSR KNE, LLC. The jury found that Mitra unlawfully discriminated against Lampkins on the basis of her sex by demoting her and cutting her hours because she was lactating.[1] The jury also found that (1) Mitra unlawfully subjected Lampkins to a hostile work environment because she was lactating and (2) Mitra's hostile work environment resulted in Lampkins' demotion, reduction in work hours, and constructive discharge. The jury awarded Lampkins $25,000 in compensatory damages and $1,500,000 in punitive damages.

Pending before me is Mitra's renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure (FRCP) and for a new trial under FRCP 59(a). D.I. 168. Mitra seeks by its motion entry of a

---

[1] Title VII, 42 U.S.C. § 2000e _et seq._, prohibits various forms of discrimination, including discrimination "because of sex" and "on the basis of sex." 42 U.S.C. 2000e-2(a) & (b). The Pregnancy Discrimination Act of 1978 (PDA), 42 U.S.C. § 2000e(k), amended Title VII to define "because of sex" and "on the basis of sex" as including "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Lactating is a medical condition related to pregnancy and therefore "discriminating against a woman who is lactating or expressing breast milk violates Title VII and the PDA." _EEOC v. Hous. Funding II, Ltd._, 717 F.3d 425, 430 (5th Cir. 2013).

judgment in its favor on Lampkins' hostile work environment and punitive damages claims or, in the alternative, a new trial on those claims. Mitra further seeks a new trial on Lampkins' disparate treatment claims. Finally, Mitra requests that in the event I deny its requests for judgment as a matter of law and a new trial, I reduce the jury's punitive damages award "to comport with constitutional limits and Title VII's statutory damages cap." *Id.* at 2.

## I. INTRODUCTION

Lampkins alleged three counts in the operative complaint (her First Amended Complaint): sex discrimination (i.e., disparate treatment[2]) (Count I) and creating and/or allowing a hostile work environment (Count II) in violation of Title VII, and failure to provide accommodations and opportunities to express breast milk (Count III) in violation of the Fair Labor Standards Acts (FLSA), 29 U.S.C. § 207(r). Before trial, I granted in part Mitra's summary judgment motion and dismissed the FLSA count. *See* D.I. 101.

Lampkins presented at trial two theories of disparate treatment liability and eight theories of hostile work environment liability. Specifically, Lampkins argued that (1) Mitra unlawfully discriminated against her by demoting her; (2) Mitra unlawfully discriminated against her by reducing her work hours; (3) her

---

[2] Following the parties' lead, I will refer to Lampkins' discrimination claims as disparate treatment claims. *See, e.g.*, D.I. 122 (jointly filed proposed jury instructions) at 33, 36.

supervisors created and subjected her to a hostile work environment; (4) her coworkers created and subjected her to a hostile work environment; (5) a hostile work environment created by her supervisors resulted in her demotion; (6) a hostile work environment created by her coworkers resulted in her demotion; (7) a hostile work environment created by her supervisors resulted in a reduction in her work hours; (8) a hostile work environment created by her coworkers resulted in a reduction in her work hours; (9) a hostile work environment created by her supervisors resulted in her constructive discharge; and (10) a hostile work environment created by her coworkers resulted in her constructive discharge.

At Lampkins' insistence, I instructed the jury (albeit reluctantly) on all ten of these theories.[3] The verdict sheet agreed to by the parties did not distinguish between supervisor and coworker liability, thus reducing the claims adjudicated by the jury to six in number (i.e., combining theories (3) with (4), (5) with (6), (7) with (8), and (9) with (10)). The jury found in Lampkins' favor on all six claims.

---

[3] I expressed on numerous occasions during trial my concern that Lampkins' insistence on presenting so many liability theories would inevitably confuse the jury. *See, e.g.*, Tr. 1077:10–23 ("THE COURT: I just think this is part of the problem. There's this conflation of theories of liability and you're trying to have [your] cake and eat it, too. You're making it every single liability theory you can, putting them all in a pot and all mixed up. . . . And because you want to instruct these jurors on all of these theories conflated together, it's not manageable. It's not fair to them. It's a mess.").

In light of the circumstances which gave rise to Lampkins' claims, one would have expected the case to be simple and straightforward. Lampkins worked for Mitra less than five months. Her claims implicate the conduct of only two supervisors and a half dozen coworkers in two small fast food restaurants. The demotion and cut in hours about which she complains resulted from a single episode—Mitra's decision in the seventh week of Lampkins' employment to transfer her to a smaller store. The demotion resulted in a cut in her hourly pay from $10.50 to $10.00.

The case, however, has proved to be anything but simple and straightforward, principally because throughout the litigation Lampkins conflated her disparate treatment and hostile work environment Title VII claims with each other and also with her FLSA claim. For its part, Mitra is not without blame, as it acceded in large part to Lampkins' conflation of theories until it was too late and never (including in its post-trial briefing) brought to the Court's attention case law from this District (and other courts) that, had the Court been aware of it, would have simplified the case long ago.[4] But putting aside the question of fault for creating the situation, I am convinced that the conflation of claims and theories of

---

[4] *See, e.g., Parker v. State of Del. Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 476 (D. Del. 1998) (refusing to allow plaintiff to base hostile work environment claim on same discrete acts that formed basis of disparate treatment claim); *Diggs v. Potter*, 700 F. Supp. 2d 20, 51 (D.D.C. 2010) (same); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 81 (D.D.C. 2007) (same).

liability undoubtedly confused the jury, unfairly prejudiced Mitra, and, because Mitra is entitled to judgment as a matter of law on Lampkins' hostile work environment claims, necessitates a new trial.

## II. LEGAL STANDARDS

### A. Judgment as A Matter of Law

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a) . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Upon a Rule 50(b) motion, a jury verdict should be overturned "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Fultz v. Dunn*, 165 F.3d 215, 218 (3d Cir. 1998) (internal quotation marks and citation omitted).

### B. New Trial

Rule 59(a) permits a district court judge, "on motion," to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." A new trial may be granted when the verdict is contrary to the evidence, where a miscarriage of justice would result if the jury's verdict were to stand, or when the court believes the verdict results from confusion. *Brown v.*

*Nutrition Mgmt. Servs. Co.*, 370 F. App'x 267, 270 (3d Cir. 2010); *see also Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1538 (5th Cir. 1984) ("A trial judge may order a new trial if he suspects that the jury verdict reflects confusion.").

## III.   EVIDENCE ADDUCED AT TRIAL

The relevant evidence adduced at trial, viewed in the light most favorable to Lampkins, established the following.

### A.   Lampkins Begins Work and Trains at Mitra's Camden Store

Mitra hired Lampkins in December 2014 to work as an Assistant Manager at a restaurant it owned in Camden, Delaware. The Camden store was a "dual brand store" that sold both KFC and Taco Bell food products.

Lampkins started work at the Camden store on December 29, 2014 as a trainee in Mitra's eight-week training program. She received positive and negative reviews during her training. She was paid at an hourly rate of $10.50. Pl. Ex. 6 at 1.

The Camden store had only two areas that were walled off within the store: the bathrooms and an office. The office housed the store's safe and therefore, for security reasons, had windows and a security camera that fed a monitor which could be viewed by Mitra's security personnel in Texas.

Lampkins breastfed her newly-born baby throughout her tenure with Mitra and she therefore needed to use a breast pump during work hours. For her first two weeks at Mitra, Lampkins breast-pumped in the women's bathroom. When a customer complained that Lampkins was tying up the bathroom, a supervisor directed Lampkins to breast-pump in the office.

Lampkins was understandably unhappy about having to breast-pump in the office. Mitra refused her request to cover the security camera lens, and thus she "fe[lt] uncomfortable because there's people that I don't even know that are able to essentially watch me doing something very private." Tr. 164:5–7. Her supervisor's recommendation that Lampkins avoid the camera lens by "fac[ing] the other way" did not alleviate Lampkins' concerns, as "fac[ing] the other way" enabled coworkers to see Lampkins breast-pump through the office's windows. Tr. 164:14–21.

On one occasion in early or mid-January 2015, while Lampkins was breast-pumping, a male coworker named Bo entered the office to check the store's computer for operational statistics. Tr. 226:21–227:5. According to Lampkins, Bo spent a "minute or two" on the computer, told Lampkins that she shouldn't breast-pump at work, and left the office. Tr. 226:6–19. Lampkins complained to a supervisor about Bo's walking in on her while she breast-pumped and his comment about her breast-pumping at work. Tr. 227:6–7. The supervisor later told

Lampkins that she had spoken to Bo about these matters. Lampkins testified that Bo never spoke to Lampkins after Lampkins complained to her supervisor and that Bo's silence was "really awkward and a little bit hostile." Tr. 165:19–23.

On another occasion at the Camden store, a male coworker named Reese "peaked in [the office window while Lampkins breast-pumped] and made like little squeezing gestures with his hands and kind of laughing, making a joke about it to others." Tr. 166:8–10. After Lampkins complained to a supervisor about Reese's conduct, the supervisor "brought in like a poster board to cover the window." Tr. 166:11–12. According to Lampkins, the poster board "solved half of the problem . . . , but we still ha[d] the major concern of the camera being in there and they wouldn't turn that off." Tr. 166:18–20.

When asked by her counsel at trial if "anyone else c[a]me into the office while you were pumping" at the Camden store, Lampkins testified that "[t]he other assistant managers occasionally would need to or they would run in really fast and Joy [the Camden store's general manager] would come in." Tr. 166:21–24. When asked "how did that make you feel?" Lampkins testified: "I was a little bit more comfortable with them just because they were females and being like I've changed in locker rooms in front of females, [and] it's easier to be comfortable around somebody of your own sex against a male walking in." Tr. 166:25–167:5.

On February 8, 2015, at the beginning of Lampkins' seventh week in the training program, her training coach, Emily Martin, sent an email with the subject line "Urgent HR issues in Delaware" to Mitra's Director of Human Resources, Nancy Jacobi. Among the various issues identified in the email, one concerned Lampkins: "External AUM trainee comes out of training next week and I need to know if when she has to pump breast milk several times while at work should she be on or off the clock?" Pl. Ex. 4 at 3. Jacobi responded to Martin's email in relevant part:

> On the young lady that needs to breast pump, not only are we required to accommodate this, but we would apply the rules just as we do when someone takes more than 30 minutes. If it is under 30 minutes, we would consider this a paid break. If more than 30 minutes is required, we would require the employee to clock out and clock back in. Out of curiosity, where is this person going to be doing this? In the office or the ladies room? Do we have outlets available for use in these places?

*Id.* at 1. In reply to Jacobi's email, Martin wrote: "Office—it has a door and outlets[.] [L]adies room is a single stall so it would tie up the restroom for too long." *Id.*

At some point in late January or early February 2015, Lampkins was informed by Martin and Joy that Lampkins was being demoted to the position of shift manager and transferred to a KFC-only (i.e., single brand) restaurant owned by Mitra in Dover, Delaware. According to Lampkins, "the first words out of

9

[Martin's] mouth was, ['] we're going to demote you because you're breastfeeding. It will be easier for you to run a single brand store and you'll have more time to step away, and once you're done nursing, you can go back into the assistant manager position that you originally were hired for.'" Tr. 169:9–14. Lampkins testified that the transfer to Dover "c[a]me with a pay cut and reduced hours, but [that Martin] assured [her] it was all for [her] own benefit, and that . . . once [Lampkins] was done [at Dover], that [Mitra] would not have any problems bringing [her] back into the assistant manager position [at Camden]." Tr. 170:1–6. Lampkins was disappointed by the transfer and demotion, but she did not complain to Mitra's human resources department because she needed the job and because "I felt like I was already being reprimanded for nursing and I didn't want them to get just get rid of me altogether." Tr. 170:17–24.

## B. Lampkins Moves to Mitra's Dover Store

Lampkins completed her training at the Camden store in the second week of February 2015. She began working as a shift manager at the Dover store on February 18, 2015. Her hourly rate was $10.00. Pl. Ex. 6 at 4.

Lampkins' typical shift at the Dover store began at 4:00 p.m. and ended at 11:00 p.m. Tr. 172:4–5. She was charged with supervising six part-time employees, whom she referred to as her "team members." Tr. 172:6–9. Lampkins

10

testified that her team members did not like the fact that she took breaks to breast-pump:

> Q.　How would you let your team members know that you were going to take a break and express breast milk?
>
> A.　I would tell them. I would give them any direction or any duties I wanted them to get done while I was on my break and then I would tell them, okay. ["]I'm going to go in the office now. I will be done in about 15 minutes["] and I would just go.
>
> Q.　So tell the jury what type of problem did you encounter, if any, with regard to expressing breast milk while at the Dover store?
>
> A.　The team members didn't want me to go. They would take attitudes with me. They would tell me that if I went to the [back] or to take a break, that they were going to leave. That they would just abandon their shift[s]. Just constant attitudes, like it was an inconvenience for me to get a break.
>
> Q.　And who specifically threatened to leave the store?
>
> A.　Destiny told me that if I went into the office, she was going to leave.
>
> * * * *
>
> Q.　Did you ever complain to Lisa [Lampkins' supervisor at the Dover store] about your team members' attitudes . . . ?
>
> A.　I brought it up to Lisa more times than I could count and she just -- she brushed off my concerns. She gave them justifications for why they were behaving that way. She just never stood behind me as a manager. She just, it just seemed like it was, like she didn't even care.
>
> Q.　What was Lisa's response to the comment that [D]estiny made to you, that she would threaten to walk out? . . .
>
> A.　Well, [D]estiny did walk out one night. She abandoned her job. I had -- I asked her to go take a customer's order at the front because she was the only register there and she kind of, she got mad. She went and took the order and then she went and took her lunch. At

the end[] of her lunch, she came into the office during the
time I was pumping. She grabbed her stuff and she left.

And so when I realized that she didn't come back,
I called Lisa. Lisa told me that she needed to research
this because Destiny's sister was the manager in the
Milford location and she was pregnant at the time. So
she was concerned something may have been serious.

Lisa came back to me and told me Destiny said
that I annoyed her. . . .

And that's why she left.

Tr. 173:8–174:1; 176:11–177:14.

As in the Camden store, the bathrooms and the office in the Dover store

were the only walled-off areas. Mitra refused Lampkins' request to cover the

security camera lens in the Dover office; and, like the Camden office, the Dover

office had windows through which coworkers could observe Lampkins breast-

pump.

In response to questions by her counsel about coworkers entering the office

in the Dover store while Lampkins breast-pumped, Lampkins testified as follows:

> Q. What about were there any instances of employees
> walking in on you?
> A. Yes. Chris. He was a new cook, so he somehow
> walked in. I don't know. Maybe the door wasn't latched
> all the way because I thought it was closed and locked,
> but he barged in and asked me how much chicken I
> wanted him to cook, so being as I was in the middle of
> pumping, I directed him to an experienced team member
> and said, ["A]sk Destiny,["] because she was on the line.
> She knew what time the chicken was up. She could
> make an educated decision.

So he went ahead and he went to [Destiny] about it and before I could even bring up the issue of him walking in on me, I received messages from Lisa reprimanding me, telling me I was wrong, that that was a manager call. ["]Destiny should not tell him how much chicken to drop["] and I should stop what I'm doing to answer his questions.

\* \* \* \*

Q.      Did you experience any other interruptions while you were expressing breast milk at the workplace in Dover?

A.      The office -- yes, I did.  The office was where everyone kept all their personal belongings, so the team members would want to come get their cellphones or their purses and things like that.  So they would come knock on the door for [their] stuff.

Q.      And what would your response be to those interruptions?

A.      If I was covered enough or if I didn't start yet, I would let them come get it.  Sometimes I would tell them that they had to wait because I would just be too exposed. It just kind of varied on those situations, but I did let them come in at times just so they could grab the[ir] phone[s] and run out really fast.

Q.      Why were you okay with that?

A.      Again, they were all females that I was letting in and I just wanted them to respect[] my pumping, which they already weren't, so I didn't really want to give them more of a reason to be insubordinate towards me.

Q.      And about how often would these type of interruptions occur?

A.      Several times a week.

Tr.  174:2–18; 175:8–176:5.

### C.    The "Jacket Incident"

Lampkins' last day of work for Mitra was April 27, 2015.  She quit the

following day because of what she described as the "jacket incident."  Tr. 183:24.

In Lampkins' words:

> Q.    Okay.  So what was the reason that you left Mitra?
> A.    The jacket incident.
> Q.    Tell us about the jacket incident?
> A.    A customer had left their jacket in the lobby area
> and while I was cleaning up the lobby, I noticed it.  None
> of the team members said it was theirs, so I put [it] in the
> office with our belongings.  I knew it was a nice jacket.
> They were going to come back for it.  I knew that, so I
> put it with our stuff because all of our stuff [was]
> together and there was no lost and found per se.
>      So that evening when I was closing, I went and
> grabbed my personal belongings out of -- my breast milk
> out of the fridge.  I turned the lights off.  I set the alarm
> and I grabbed my stuff out of the office, clocked out, and
> went home.  And the next day I woke up to several text
> messages, several Facebook messages from other people
> at the store, asking if I had taken this jacket.  And I told
> them, no, I don't think I did.  I said, let me just double-
> check.
>      I went to my car and there was the jacket in there,
> so I called Lisa and I told her, hey, Lisa, I accidentally
> grabbed this jacket last night and I'm getting messages
> about it.
>      And she kind of huffed at me, like [sighed] and
> was, like, well, I have to talk to Emily about this.  I told
> her, okay.  Well, I will bring it in for my shift.  I will
> have it back to you guys before tonight.
>      And before I even went in, I was receiving text
> messages from my friends telling me that the rumor was I
> was going to be terminated and they were trying to make
> it look[] like I was stealing, and at this point I was upset
> about it.  On top of everything they had done, I did not

want them to make me look like a thief, so I decided that it was time for me to just end my employment there rather than be terminated and have to put that on my resume.

Q. And what did you do with the jacket?

A. I gave it to my son's father Matthew, because I was very, very upset about it, and I didn't want to go see them and face them after everything, so I asked him to turn it in for me and he took my keys, my uniform and the jacket and brought it back to the store and told them that I would no longer be there.

Tr. 183:23–185:14.

### D.    Lampkins' Summary Testimony

Lampkins concluded her direct examination at trial with the following

summary testimony:

Q. Okay. Once you got to Dover, what made it difficult, if anything, for you to do your job?

A. The only thing [that] made it difficult for me to do my job was the insubordination I received from the team members and Lisa's lack of support.

Q. And why were the team members in[]subordinate to you? . . .

What did they tell you?

A. They told me things like they didn't want me to go pump and they didn't want[] to pick up my slack and they weren't going to -- they were going to leave if I did it. You know, if I did take that break, and it was a nightmare.

Tr. 185:23–186:11.

## IV.  DISCUSSION

### A.  The Jury Could Not Reasonably Find that Lampkins was Subjected to A Hostile Work Environment

For her hostile work environment claim, Lampkins was required to prove that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there is a basis for holding her employer liable. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

The Supreme Court has repeatedly emphasized that, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation and alteration marks omitted).  The objectionable conduct "must be both objectively and subjectively offensive, [such] that a reasonable person would find [the conduct] hostile or abusive, and . . . the victim in fact did perceive [the conduct] to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

In *Clark City School District v. Breeden*, 532 U.S. 268 (2001), the Supreme Court instructed that

> [w]orkplace conduct is not measured in isolation; instead,
> "whether an environment is sufficiently hostile or
> abusive" must be judged "by 'looking at all the

16

> circumstances,' including the 'frequency of the
> discriminatory conduct; its severity; whether it is
> physically threatening or humiliating, or a mere offensive
> utterance; and whether it unreasonably interferes with an
> employee's work performance.'" Hence, "[a] recurring
> point in [our] opinions is that simple teasing, offhand
> comments, and isolated incidents (unless extremely
> serious) will not amount to discriminatory changes in
> 'the terms and conditions of employment.'"

*Id.* at 270–71 (alterations in original) (citations omitted). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted).

Mitra argues that there was insufficient evidence to support a finding that Lampkins was subjected to intentionally discriminatory conduct that was severe or pervasive or that would detrimentally affect a reasonable person in Lampkins' circumstances. In response, Lampkins points to 14 circumstances she claims collectively amount to severe or pervasive discriminatory harassment based on her lactating condition. In the words of Lampkins' counsel:

> In Camden, Autumn let her co-workers know when she
> was going to the office to pump. In Camden, Autumn
> endured the following: [1] "Reese" peeped into the office
> while Autumn was pumping and made squeezing hand
> gestures; [2] Bo O'Connell ("O'Connell[")]) entered the
> office while Autumn was in there at least once and told
> her she should be pumping at home; [3] although
> O'Connell may or may not have walked in on her again,
> he awkwardly refused to talk to her again, which Autumn

took as hostile; [4] management level employees were complaining about Autumn's pumping; [5] Autumn had to pump in an office where she had to choose whether to have her privacy violated by pumping in front of a window or in front of a surveillance camera; and [6] she was demoted.

In Dover, defense witness Kanita Stewart stated that when Autumn went to the office, everyone knew she was going to pump and not to enter the closed office without knocking. Nonetheless, Autumn endured the following in Dover: [7] a cook, Chris, opened the closed office door to find out how much chicken to cook; [8] another [unnamed] cook peered in the window into the office on two occasions; [9] team members staged a mutiny and called Autumn's boss when she tried to pump; [10] one team member walked out on her shift; [11] Autumn's attempts to cover up the window were stymied; [12] Lisa told Autumn, apparently falsely, that a customer saw Autumn's breast; [13] Autumn was forced to sit where the camera was aimed despite the fact there was an ostensible "blind spot" in the office; and [14] her hours were cut.

D.I. 172 at 2–4. I will address these circumstances individually and then collectively.

### 1. Reese's "Peeping" in the Office (Circumstance 1)

Lampkins testified that on a single occasion while she breast-pumped in the Camden store's office, a male team member named Reese "peaked in" the office window and "made like little squeezing gestures with his hands and kind of laughing, making a joke about it to others." Tr. 166:7–13. The Supreme Court's holding in *Breeden* makes clear that this type of "simple teasing, offhand

18

comment[], and isolated incident[]" is insufficient as a matter of law to give rise to a hostile work environment claim. 532 U.S. at 271. Moreover, Lampkins testified that after she complained about Reese's behavior, her supervisor covered the Camden office window with a poster and, in Lampkins' words, "solved . . . th[at] problem." Tr. 166:18.

### 2. Bo's Entrance into the Camden Store Office and Comment to Lampkins (Circumstances 2 and 3)

Lampkins testified that Bo entered the Camden office on a single occasion while she breast-pumped and told her she should be pumping at home. But she acknowledged that Bo entered the office for a legitimate business purpose (to check the computer for operational statistics) and stayed only "[a] minute or two." Tr. 226:18–19. This brief and isolated incident was neither abusive nor threatening, and there was no evidence that Lampkins subjectively felt that the incident interfered with her work performance or otherwise detrimentally affected her. Lampkins testified that after she complained to her supervisor about the incident and the supervisor spoke to Bo about it, Bo never again spoke with her and that Lampkins found his silence to be "really awkward and a little bit hostile." Tr. 165:19–23. But regardless of Lampkins' subjective feelings, Bo's subsequent silence would not detrimentally affect a reasonable person in Lampkins' circumstances, and it does not amount to the type of abusive behavior required to sustain a hostile work environment claim.

### 3. Managerial Complaints about Lampkins' Breast-Pumping (Circumstance 4)

In support of her assertion that "management level employees . . .

complain[ed] about [her] pumping," D.I. 172 at 3, Lampkins cites to the following

testimony of Nakia Anderson, a former coworker of Lampkins at the Camden

store:

> Q.     Okay.  And what, if any, complaints about Autumn
> pumping in the office did you ever learn about while you
> were working in the Camden store with Autumn?
> A.     One of the managers used to complain about it
> because, like, she would have to put the stuff in the walk-
> in cooler and so like a lot of people didn't like that
> because that's where the food is that we actually have to
> serve, and then there were complaints because sometimes
> we could be in the middle of like a rush and she would
> have to walk away from the line, and there was they were
> like struggling because we were short a person.  In the
> middle of a rush means at least three on each side.
> Q.     Okay.  And who do you remember making those
> complaints, if you can recall?
> A.     I know Joanna was one of them.  Some of the crew
> members would complain as well.
> Q.     Okay.  Joanna Butz?
> A.     Yes.

Tr. at 478:11–479:7.

The only "complaint[]" here about which Anderson testified and attributed

to "[o]ne of the managers" was specifically about storing breastmilk in the walk-in

freezer—not about Lampkins' breast-pumping or lactating status.  Moreover,

Anderson's testimony does not reveal any instance of a manager complaining other

than this one isolated incident. *See Breeden*, 532 U.S. at 271. Furthermore, there is no evidence—and no reason to infer—that this one incident of a managerial complaint was threatening, humiliating, or abusive. *See id.*

> **4.    The Fact that Lampkins Had to Breast-Pump in An Office with a Security Camera and Windows That Afforded Her Insufficient Privacy (Circumstances 5 and 13)**

Lampkins' pointing to Mitra's failure to provide her a more private place to breast-pump as evidence that Mitra subjected her to a hostile work environment runs afoul of my pre-trial order that granted in part Mitra's motion *in limine*, *see* D.I. 132, and also conflicts with Lampkins' own counsel's acknowledgment before trial that Title VII is not an accommodations statute, *see* Jan. 8, 2019 Tr. at 141:11. As noted in my *in limine* order (and as has been held by every court that has addressed the issue), Title VII does not impose liability on employers for failing to provide suitable times or places for breast-pumping at work. *See* D.I. 132 at 2 and cases cited therein. Although the Pregnancy Discrimination Act amendments to Title VII prohibit employers from taking adverse actions based on a woman's lactating status, they do not require employers to provide accommodations for breast-pumping. For that reason, I granted Mitra's motion *in limine* insofar as it sought to preclude Lampkins from introducing in support of her hostile work environment claim "evidence of the alleged harm that [she] claims she suffered by the denial of breaks and the lack of a private place to express milk." D.I. 132 at 1.

That is not to say that the conditions in which Mitra required Lampkins to breast-pump were irrelevant to her case. On the contrary, I denied Mitra's motion *in limine* insofar as it sought to preclude Lampkins from introducing at trial and relying on in support of her hostile work environment claim "evidence that she was not provided an exclusively private place to express breast milk" and "evidence regarding the existence of a security camera in the office." D.I. 132 at 4. This latter evidence, as I explained in the *in limine* order, was "central to understanding the circumstances in which [Lampkins'] co-workers encountered her and harassed her as alleged in her complaint." D.I. 132 at 3.

In contrast to Title VII, the FLSA *does* require certain employers to provide a nursing mother under their employ a reasonable break time and a private place other than a bathroom to express breast milk for one year after the birth of her child. *See* 29 U.S.C. § 207(r)(1). Moreover, as I held in a pre-trial Memorandum Opinion, section 216(b) of the FLSA creates a private right of action to enforce this requirement. D.I. 101 at 12; *see also Tolene v. T-Mobile, USA, Inc.*, 178 F. Supp. 3d 674, 680 (N.D. Ill. 2016) (holding "there is a limited private right of action for the enumerated damages in § 216(b) . . . to enforce violations of § 207(r)"); *Hicks v. City of Tuscaloosa*, 2015 WL 6123209, at *29 (N.D. Ala. Oct. 19, 2015) (same); *Lico v. TD Bank*, 2015 WL 3467159, at *3 (E.D.N.Y. June 1, 2015) (same). *But see Eddins v. SSP Am., Inc.*, 2013 WL 12128683, at *3 (S.D. Iowa Jan. 31, 2013)

("[T]he [FLSA] regulations do not currently provide for a private cause of action under § 207(r).");  *Ames v. Nationwide Mutual Ins. Co.*, 2012 WL 12861597, at *6 n.26 (S.D. Iowa Oct. 16, 2012) ("hold[ing] that the FLSA does not provide a private cause of action to remedy alleged violations of § 207(r)"); *Salz v. Casey's Mktg. Co.*, 2012 WL 2952998, at *3 (N.D. Iowa July 19, 2012) ("Since Section 207(r)(2) provides that employers are not required to compensate employees for time spent express milking, and Section 216 (b) provides that enforcement of Section 207 is limited to unpaid wages, there does not appear to be a manner of enforcing the express breast milk provisions.").

Section 216(b), however, does not offer Lampkins the remedy she seeks in this case—i.e., lost wages; and therefore I granted in part before trial Mitra's motion for summary and dismissed Lampkins' FLSA claim. *See* D.I. 101 at 13 (noting that "[b]y its express terms, § 216(b) limits the remedies available for violations of § 207(r) to 'unpaid minimum wages' and 'unpaid overtime compensation'"). Notwithstanding the dismissal of her FLSA claim and my *in limine* order, Lampkins in effect litigated in front of the jury an unreasonable accommodations case, *see, e.g.*, Tr. 163:9–15; 167:18–168:9; 178:10–179:10; 261:14–263:1; 326:23–327:8; 406:25–407:9; 477:24–478:1; 512:22–514:1; 560:3–8; 991:24–993:22; 1002:18–1003:8; 1004:16; 1021:16–17; and she is now asking the Court to sustain her hostile work environment claim based on Mitra's failure to

provide her reasonable accommodations to breast-pump. As inadequate as I might personally find the breast-pumping accommodations Mitra offered Lampkins, the unreasonableness of the accommodations is not cognizable under Title VII and does not establish a hostile work environment.

### 5. Lampkins' Demotion and Reduction in Work Hours (Circumstances 6 and 14)

Lampkins asserts that her demotion and reduction in work hours—the very same acts upon which she based the disparate treatment claims she won at trial—constitute evidence of a hostile work environment. A plaintiff, however, "cannot base her hostile work environment claim on the gender-based employment decisions that underpin her disparate treatment claim[s]." *Parker*, 11 F. Supp. 2d at 476. As Judge Schwartz explained in *Parker*:

> [T]he dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address.
>
> The United States Supreme Court taught in the seminal case on hostile work environment claims, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), that such claims are grounded in sexual harassment. *Id.* at 64–65, 106 S.Ct. 2399. Such harassment may take the form of "'unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Id.* at 65, 106 S.Ct. 2399 (quoting 29 C.F.R. § 1604.11(a)). When not in the form of an economic quid

pro quo, sexual harassment has the "'purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" 477 U.S. at 65, 106 S.Ct. 2399 (quoting 29 C.F.R. § 1604.11(a)(3)). As the Supreme Court discussed, hostile work environment claims provide a means of redress under Title VII for discrimination that does not take the more traditional form of a tangible or economic loss but rather for discrimination that contaminates the psychological aspects of the workplace to the degree that the conditions of the workplace are altered. 477 U.S. at 64–67, 106 S.Ct. 2399.

Although the assignment of a hostile supervisor and false accusations by that supervisor could be classified as the kind of "discriminatory intimidation, ridicule and insult" addressed by a hostile work environment claim, 477 U.S. at 65, 106 S.Ct. 2399, the more favorable treatment of men with respect to troop and shift assignments and transfer opportunities could not. *See* MATTHEW BENDER, EMPLOYMENT DISCRIMINATION, §§ 46.01–46.03 (2d ed.1995) (discussing acts that constitute sexual harassment). Instead, these latter forms of discrimination present basic disparate treatment scenarios, that is, the kind of tangible or economic losses that the *Vinson* Court contrasted with a hostile environment. Such disparate treatment consists of employment policies or employment decisions involving, for example, hiring, firing, benefits, promotions and compensation. *See* BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW, Chpt. 2 (3d ed.1997) (discussing acts that constitute disparate treatment).

*Id.* at 475–76; *see also Diggs*, 700 F. Supp. 2d at 51 ("Plaintiff cannot rely on the discrete acts upon which he bases his claims of discrimination . . . to establish he

was subject to a hostile work environment."); *Rattigan*, 503 F. Supp. 2d at 81 ("Plaintiff should not be permitted to 'bootstrap' his alleged discreet acts of discrimination . . . into a broader hostile work environment claim."). Accordingly, Lampkins' demotion and cut in hours cannot sustain her claims that a hostile work environment resulted in her demotion and cut in hours.

Nor can Lampkins' demotion and reduction in work hours sustain her claims that she was subjected to a hostile work environment generally and that a hostile work environment resulted in her constructive discharge. The demotion and cut in hours were the consequence of the decision to transfer Lampkins to the Dover store—a one-time event. Even if a single episode of harassment could create a hostile work environment, Mitra's decision to transfer Lampkins to the Dover store was not, even if viewed in the light most favorable to Lampkins, the type of invidious or abusive conduct that by itself would be so severe that a reasonable person in Lampkins' situation would deem it hostile. *See Faragher*, 524 U.S. at 787.

### 6. Chris's "Walking in" on Lampkins (Circumstance 7)

Lampkins testified as follows about her encounter with Chris, a cook who worked under her supervision at the Dover store:

> Q. What about were there any instances of employees walking in on you?
> A. Yes. Chris. He was a new cook, so he somehow walked in. I don't know. Maybe the door wasn't latched

all the way because I thought it was closed and locked, but he barged in and asked me how much chicken I wanted him to cook, so being as I was in the middle of pumping, I directed him to an experienced team member and said, ["A]sk Destiny,["] because she was on the line. She knew what time the chicken was up. She could make an educated decision.

So he went ahead and he went to [Destiny] about it and before I could even bring up the issue of him walking in on me, I received messages from Lisa reprimanding me, telling me I was wrong, that that was a manager call. ["]Destiny should not tell him how much chicken to drop and I should stop what I'm doing to answer his questions.["]

\* \* \* \*

Q.  . . . And now, Chris wouldn't have had a key to the office door there; right?

A.  No.

Q.  Okay.  So if he walked in, it's because the door wasn't fully shut?

A.  It wasn't fully shut or may have not, I might have forgotten to lock it that one time.  I'm not exactly sure.

Q.  Okay.  Then he wanted to know how much chicken to cook?

A.  Yes. . . .

Q.  And you don't think Chris was purposely trying to harass you when he asked how much chicken to cook?

A.  I think he just needed direction.

Q.  Wasn't that your job, to give direction to the staff?

A.  It was.

Tr. 174:2–18; 229:14–230:7.  This testimony speaks for itself.  A reasonable juror could not find based on this testimony that Chris's actions were discriminatory, abusive, or derogatory or contributed in any way to a hostile working environment. Nor could a juror reasonably conclude that Lisa's admonishment of Lampkins for

sending Chris to Destiny for directions was linked to Lampkins' breast-pumping since Lampkins testified that Lisa admonished Lampkins "*before* I could even bring up the issue of him walking in on me."

### 7. "Peering" by the Unnamed Cook (Circumstance 8)

Lampkins cites the following testimony of her supervisor, Lisa Rhinehardt, as evidence that an unnamed cook "peered in the window into the [Dover] office on two occasions":

> Q.     All right. Now, isn't it true that your cook at Dover looked through the window to the door of the office twice while Autumn was pumping and saw her breasts?
> A.     He was trying to get her attention for a question, yes, and didn't know her shirt was off.
> Q.     Okay. And after he walked in on her twice, he didn't want to work on Autumn's shifts; is that correct?
> A.     Yes. He was uncomfortable.

Tr. 557:1–8; *see also* D.I. 172 at 3 n. 26 (citing Tr. 557:6–8).[5] This testimony in no way suggests that the unnamed cook was discriminating against Lampkins or harassing her. On the contrary, the testimony establishes that the cook was uncomfortable because on two occasions when he "tr[ied] to get [Lampkins']

---

[5] The misleading nature of the questioning by Lampkins' counsel in the quoted excerpt from the trial transcript was not lost on the Court. Counsel's initial question to Rhinehardt asked for confirmation that the cook had "looked through the window to the door of the office twice." Tr. 557:1–3. After Rhinehardt provided that confirmation, counsel immediately followed up with "[a]nd after he walked in on her twice," thereby misstating the witness's testimony. Tr. 557:6.

attention" to ask her a question, he saw Lampkins' breasts because he "didn't know her shirt was off." Moreover, there is no evidence that Lampkins knew that the unnamed cook had seen her breast-pumping, and therefore it cannot be said that the cook's actions detrimentally affected Lampkins.

### 8. "Mutiny" by Lampkins' Team Members (Circumstance 9)

The evidence that Lampkins cites in support of her assertion that her team members "staged a mutiny," *see* D.I. 172 at 3 & n.27, establishes at most that she had problems and poor relations with her coworkers and that her coworkers were unhappy that they had to work while Lampkins was able to take breaks. Lampkins points to no instance where a coworker was threatening, abusive, or hostile to her because she was lactating. Her coworkers' resentment of her arose not because she was lactating, but because she took breaks while they had to work. As Lampkins herself testified: "They told me things like they didn't want me to go pump *and they didn't want to pick up my slack . . . .*" Tr. 186:8–9 (emphasis added).

### 9. Destiny's Walking Out During Her Shift (Circumstance 10)

Lampkins similarly points to no evidence that Destiny's "walk[ing] out on her [own] shift" was directed at Lampkins' lactating status. According to Lampkins' own testimony, Destiny's walking out was because Lampkins "annoyed her." *See* Tr. at 177:3–12. Lampkins' testimony further established that Destiny, like Lampkins' other coworkers, resented that she had to work while Lampkins

took breaks. *See* Tr. 173:18–21 ("The team members[, including Destiny,] didn't want me to go [on breaks]. They would take attitudes with me. They would tell me that if I went to the [back] or to take a break, that they were going to leave.").

Finally, even if Destiny's annoyance with Lampkins could be linked with Lampkins' lactating status, Destiny's walking out on her shift was a one-time, isolated occurrence that was neither physically threatening nor abusive and cannot sustain a hostile work environment claim. *See Breeden*, 532 U.S. at 271.

### 10. Lampkins' "Stymied" Attempts to Cover the Dover Office Window (Circumstance 11)

Lampkins next argues that, at the Dover store, her "attempts to cover up the [the office's] window were stymied." D.I. 172 at 3 & n.29. The only testimony cited by Lampkins that relates to this assertion is the following:

> Q.     And how did you attempt to address any privacy concerns you had with the office in Dover?
> A.     On the window, Lisa [Lampkins' supervisor at Dover] had already printed out like praises from surveys that were taken about doing well, so I printed out a few that highlighted my nighttime co-workers about, you know, positive things and I put those on the windows. And the very next shift I came in, only mine had been removed. The daytime people, their praises were still there, but the nighttime ones were torn down and never to be found again.
> Q.     Who took it down?
> A.     I could only assume it was Lisa, because she was the only person with the authority or access to the office really.
>         [Mitra's Counsel]: I move to strike.

30

> THE COURT: Sustained. I'm going to strike it. You can't assume as a testifier. You can only testify about something you know. So the witness' testimony regarding her assumption is struck.

Tr. 181:21–182:14.

Lampkins' reliance on this testimony is problematic for a number of reasons. First, to the extent the testimony addresses the lack of privacy afforded by the accommodations Mitra was willing to give its lactating employees, it is, as discussed above, irrelevant. *See supra* Section IV.A.4. Second, the testimony establishes that only the surveys for Lampkins' shift were removed. Since the surveys for other shifts were left on the windows, the testimony does not support the notion that the surveys were removed in order to make the office visible from the outside. Third, nothing in the record suggests that the surveys were removed because of Lampkins' lactating status. Indeed, Lampkins did not know who took down her shift's surveys, and she did not suggest nor have any basis to conclude why the surveys were taken down. Fourth, the removal of the surveys was neither threatening nor abusive and was an isolated event. *See Breeden*, 532 U.S. at 271.

### 11. Lisa's Report That a Customer Saw Lampkins' Breast (Circumstance 12)

Finally, Lampkins argues that her supervisor "Lisa told [her], apparently falsely, that a customer saw [her] breast." D.I. 172 at 3–4 & n.30 (citing Tr. at

181:9–20, 581:24–582:1). In support of this argument, Lampkins cites the

following testimony from her own direct examination:

> A.    . . . Lisa told me that a customer had seen my
> breasts and at the time I was very confused as to how that
> was even possible because from the front line, a customer
> could not see where I was at in the office. But it was, she
> did tell me that a customer had seen my breasts and
> complained about it.
> Q.    And how did she convey that to you?
> A.    Like it was a problem, like I had done something
> wrong even though it was me who should have been
> upset about it. She -- it was like I was being reprimanded
> again, not like it was a coaching moment or something to
> bring to my attention. It was like I was in trouble for
> doing it.

Tr. at 181:9–20. Although Lisa testified at trial, neither party asked her whether

she ever told Lampkins that a customer saw Lampkins' breasts. Lampkins'

counsel asked Lisa on cross-examination whether it was "true that a customer

could not see in the office when Autumn was pumping?" and Lisa replied,

"Correct." Tr. at 581:24–582:1.

Lampkins offers no explanation about how Lisa's "apparently false[]"

statement bears on Mitra's pending motion. My best guess as to why the

"apparently false" statement could be relevant is that it arguably could suggest that

Lisa harbored animus towards Lampkins based on Lampkins' lactating status. In

any event, Lampkins testified only that she was "confused" by Lisa's statement

and did not suggest in any way that she found Lisa's statement to be abusive, harassing, or hostile.

## 12. The Circumstances Considered in Their Totality

As noted, two of the 14 circumstances cited by Lampkins cannot as a matter of law provide the basis of her hostile work environment claims because they relate to the reasonableness of Mitra's breast-pumping accommodations (circumstances 5 and 13). Another two of the circumstances cannot as a matter of law provide the basis of her claims that a hostile work environment resulted in her demotion and reduction in hours (circumstances 6 and 14), because they underpin Lampkins' disparate treatment claims. But even if these four circumstances are considered, the 14 circumstances viewed in their totality could not as a matter of law sustain a jury's finding that Mitra subjected Lampkins to a hostile work environment. None of the incidents cited by Lampkins involved a derogatory statement toward Lampkins based on her lactating status (or even based on her sex). None of the incidents were threatening, abusive, or hostile. And none of the cited incidents—either individually or in combination with another—constituted harassment.

Lampkins makes much of the fact that four male coworkers—on separate and momentary occasions—saw her breast-pumping during the four-and-one-half months she worked at Mitra. As an initial matter, even giving Lampkins the advantage of every fair and reasonable inference, there is no evidence that any of

the men actually saw Lampkins' breasts. (Lampkins testified that she covered herself when she breast-pumped.[6]) Two of the men, Bo and Chris, saw Lampkins breast-pump when they entered the office. It is undisputed, however, that they both entered the office for legitimate business purposes and stayed in the office for only a minute or two. With respect to the unnamed cook who told Lisa he had seen Lampkins breast-pump, Lampkins had no awareness at the time of her employment that she had been seen by this person.

The only conduct Lampkins encountered that could reasonably be deemed to be offensive was the "squeezing hand gestures" Reese made when he saw Lampkins breast-pumping through the Camden store office window. But Lampkins never suggested that she felt threatened or humiliated by these gestures; and this isolated incident is akin to "a mere offensive utterance," which the Supreme Court has deemed insufficient to support a hostile work environment finding. *See Breeden*, 532 U.S. at 271.

There is, finally, no evidence that anyone other than Bo (who told Lampkins she should breast-pump at home) and Lampkins' supervisors (whose actions

---

[6] Lampkins testified that she wore a "breast cover" when she pumped that "covered the front" and "it kind of covered the side" though it "moved freely." Tr. 217:6–11. The only evidence adduced at trial that a person actually saw Lampkins' breasts was Lampkins' testimony that Lisa told Lampkins that a customer saw her breasts. But, as noted above, Lampkins argues that this testimony was "apparently false."

formed the basis of Lampkins' disparate treatment claims) harbored any animus

towards Lampkins based on her lactating status (or her sex). *See Breeden*, 532

U.S. at 271. Lampkins argues that "[l]actation was the [m]otivation for [a]ll of

Mitra's [d]iscrimination." D.I. 172 at 9. She cites in support of this argument (1)

the emails exchanged between Jacobi and Martin; (2) her testimony that Martin

told Lampkins soon after the email exchange that she was being transferred to a

single-brand store, demoted, and getting her hours reduced because she was breast-

pumping; and (3) Lisa's reduction of Lampkins' work hours after Lampkins moved

to the Dover store. *Id.* at 9–10. But this evidence of Lampkins' supervisors' intent

and motivation bears on Lampkins' disparate treatment claims, not on her hostile

work environment claims.

Viewed in the light most favorable to Lampkins, the circumstances

identified by Lampkins establish that she had an unpleasant relationship with her

coworkers, and that her coworkers resented her for taking so many breaks to pump.

As Lampkins testified at the conclusion of her direct testimony at trial: "*the only*

*thing* that made it difficult for [her] to do [her] job was the insubordination" of her

team members; and they were insubordinate because "they didn't want [Lampkins]

to go pump and they didn't want to pick up [Lampkins'] slack." Tr. 185–86

(emphasis added).

In sum, the isolated incidents of conduct cited by Lampkins were not "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Vinson*, 477 U.S. at 67. Accordingly, I will enter judgment as a matter of law on Lampkins' hostile work environment claims.

## B. A New Trial is Required

Having concluded that the jury's findings in favor of Lampkins' hostile work environment claims were unreasonable and should be overturned, I believe that it would be a miscarriage of justice to allow the jury's disparate treatment findings to stand, as I think the jury was confused by the various and conflated theories of liability presented both explicitly and implicitly by Lampkins at trial.

As an initial matter, I am concerned that the emphasis Lampkins placed at trial on the suitability of Mitra's breast-pumping accommodations effectively made that issue the dispositive question for the jury. *See, e.g.*, Tr. 163:9–15; 167:18–168:9; 178:10–179:10; 261:14–263:1; 326:23–327:8; 406:25–407:9; 477:24–478:1; 512:22–514:1; 560:3–8; 991:24–993:22; 1002:18–1003:8; 1004:16; 1021:16–17. Mitra bears some responsibility for Lampkins' tactic, as it moved *in limine* before trial to limit the use of accommodations evidence only to the extent Lampkins sought to introduce that evidence "in support of her claim that she was subjected to a hostile work environment." D.I. 113 at 1. I granted the motion, but

36

because Mitra failed to timely move *in limine* to preclude Lampkins from introducing the same evidence in support of her disparate treatment claims, much of the accommodations evidence was presented at trial and Lampkins' counsel repeatedly suggested both expressly and impliedly that Mitra should be held liable because it failed to provide Lampkins suitable accommodations to breast-pump. In his closing argument, for example, counsel made ten references to the "surveillance camera" in the office and said the camera was "significant because . . . [Lampkins] had to have a hundred percent privacy," that "again, the privacy was an issue," and that Lampkins "was constantly subjected to a lack of privacy when she pumped." Tr. 1002:18–1003:8; 1004:16, 1021:16–17.

As Lampkins' counsel acknowledged before trial, however, Title VII is not an accommodations statute. Claims based on the adequacy and frequency of breast-pumping accommodations fall exclusively under the FLSA. The remedies available under the FLSA are determined exclusively by Congress; and Congress saw fit not to provide plaintiffs whose employers fail to provide adequate breast-pumping accommodations the remedies Lampkins sought in this case. That is why I granted Mitra's pretrial request to dismiss Lampkins' FLSA claim and that is why Mitra was unfairly prejudiced by Lampkins' strategic decision to try in effect an accommodations case before the jury.

Second, Lampkins' insistence on conflating her disparate treatment and hostile working environment claims undoubtedly confused the jury. Lampkins presented ten different theories of Title VII liability. The theories overlapped and in some instances were conflicting and made no sense. For example, although Lampkins testified that her supervisor explicitly told her that she was being transferred (and thus being demoted and having her hours cut) "because you're breastfeeding," Lampkins refused to limit herself to a disparate treatment theory and insisted on an instruction to the jury on constructive demotion and reduction-in-hours theories based on the conduct of her coworkers—i.e., that the hostile work environment created by her coworkers was so severe and pervasive that it resulted in Lampkins' demotion and reduction in hours.

Because I am convinced that the various and overlapping liability theories Lampkins presented at trial confused the jury and because no reasonable juror could have concluded that Lampkins was subjected to a hostile work environment, I will grant Mitra's request for a new trial on Lampkins' disparate treatment claims. *See Brown*, 370 F. App'x at 270; *Nissho-Iwai Co.*, 729 F.2d at 1538.

## V. CONCLUSION

For the reasons discussed above, I will grant Mitra's renewed motion for judgment as a matter of law under FRCP 50(b) on Lampkins' hostile work

environment claims and a new trial on her remaining claims under FRCP 59(a).[7]

As a result, Mitra's request for judgment as a matter of law on Lampkins' punitive damages claim and Mitra's alternative requests for a new trial on Lampkins' hostile work environment claims and a reduction in the jury's punitive damages award are rendered moot.

The Court will issue an order consistent with this Memorandum Opinion.

---

[7] I also conditionally find, as required by FRCP 50(c)(1), that, because the various and overlapping liability theories Lampkins presented at trial undoubtedly confused the jury, Mitra's alternative request for a new trial on Lampkins' hostile work environment claims should be granted if the judgment is later vacated or reversed.